985 A.2d 102

**In re LAVAR D., Britny C. & Ronald B.**

Nos. 604, 605 and 634 Sept.Term, 2008.

Court of Special Appeals of Maryland.

Dec. 30, 2009.

528

530

Marc A. DeSimone, Jr. (Nancy S. Forster, Public Defender, on the brief), Baltimore, MD, for Appellant.

Michelle W. Cole (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD., for Appellee.

Panel: HOLLANDER, JAMES R. EYLER and MATRICCIANI, JJ.

JAMES R. EYLER, Judge.

Ronald B., Britny C., and Lavar D., appellants,[1] were charged in the Circuit Court for Baltimore City, in separately filed delinquency petitions, with assault and related offenses, arising out of an altercation between appellants and the victims, Sarah Kreager and Troy Ennis, on a Mass Transit Administration ("MTA") bus on the afternoon of December 4, 2007. After proceedings, the circuit court, sitting as a juvenile court, found each appellant involved as to charges of assault in

---

1. Two other juveniles, Nakita M. and Wesley B. were adjudicated jointly with appellants below. Nakita M. and Wesley B. are not parties to this appeal, however. A sixth child, Shamira B., also participated in the preliminary hearings in the juvenile court, but pled involved prior to the adjudicatory hearings.

the first degree, assault in the second degree, conspiracy to commit assault in the first degree, disorderly conduct, and reckless endangerment. Appellants were acquitted of several other charges. Subsequently, the court placed each appellant under the control of the Department of Juvenile Services for community-based placement and other rehabilitative services, and also required each appellant to complete fifty hours of community service. On May 19, 2008, Lavar D. and Britny C. noted appeals. On May 23, 2008, Ronald B. noted an appeal. On September 11, 2008, we consolidated the cases for purposes of appeal.

In this Court, appellants raise several questions for our consideration. They are, as phrased by appellants, as follows:

1. Where appellants were charged with assault and related offenses and the judge, sitting as fact-finder, recognized that self-defense "has been raised in this case," did the judge impermissibly shift the burden of proof when he stated that "the burden of proving self defense rest[s] upon the person accused of the assault"?

2. Where defense counsel proffered that the alleged victim had testified in the disposition hearing of a co-respondent, held before the same judge sitting as fact-finder in the present case, that her children were not in custody solely because of this incident, did the court err in prohibiting defense counsel from cross-examining the victim as to whether she had a pending charge for distribution of narcotics, where the alleged sale of drugs occurred in the presence of her three children?

3. Is the evidence sufficient to establish that each appellant is a delinquent child?

4. Where the interrogating officer urged Mr. B. to "[h]help [sic] yourself" before "four [other respondents] tell me exactly what happened and exactly what you did" and emphasized that "[a]fter now is too late" did the lower court err in finding that the resulting custodial statement was not the product of police inducement?

5. [Appellants' argument # 5 was withdrawn].

6. Did the lower court err in precluding cross-examination of Mr. Ennis concerning past domestic violence of Ms. Kreager?

7. Did the lower court err in allowing the State to introduce statements by co-respondents with blank and omitted passages containing redacted statements implicating the other respondents?

8. Did the lower court err in prohibiting the accused from refreshing one victim's recollection of whether he had made prior false statements to the police when it ruled that "you can't use a document he didn't prepare to refresh his recollection"?

We shall affirm.

## Factual Background

On January 31, 2008, the first day of pretrial motions hearings, appellants moved for suppression of their statements to MTA police, arguing that the statements were coerced. When the State attempted to play the taped statements for the court, counsel for Nakita M. argued that "if the State is going to play the one part," as to the voluntariness of the statement, "I would ask that the State play both parts or the whole thing." Subsequently, the following colloquy ensued, in pertinent part.

THE STATE: Your Honor, the State's intent is to, there are certain portions that the State does not believe are admissible and the State, it's planning to stop at those points. Counsel does have a copy of a transcript that indicates those stoppage points. I don't know if that's what counsel's referring to.

THE COURT: I don't know either.

* * *

THE COURT: Could you help me out, [counsel for Nakita M.]?

COUNSEL FOR NAKITA M.: Yes, I can, Your Honor. If the State intends to play one part, the State should play every part of the tape. But at this point, Your Honor—

THE COURT: Well, but the only thing that's relevant at this time is whether or not, you raised an objection, I believe, to the voluntariness.

COUNSEL FOR NAKITA M.: Yes, Your Honor.

THE COURT: So that's, that's what's relevant. So the— what's germane to this hearing is the part of the tape that goes to the issue of whether or not your client's statements were freely and voluntarily given so that's what I'm hoping we'll hear.

COUNSEL FOR NAKITA M.: Well, at this point, Your Honor, if the State is picking and choosing what they choose to let the [c]ourt hear,—

THE COURT: Well, unless, if I decide [counsel for Nakita M.] that it's not freely and voluntarily given, none of it comes in. If I, so for me to watch the whole tape means the cat's out of the bag, doesn't it? So the part you all don't want me to see I've then seen. What's at issue here is whether or not this statement is freely and voluntarily given.

* * *

(Whereupon, counsel approached the bench and the following ensued:)

* * *

THE COURT: See, I thought it [sic] I can see the whole thing if this were a jury trial. But I'm the trier of fact so once I see it, you know—

COUNSEL FOR LAVAR D.: But, Your Honor, this is the same issue I was discussing in the office. They cannot redact *Bruton*[2] on their own. The solution in this kind of case is to sever these trials so that if—

THE COURT: This isn't *Bruton.* Only, this is a—

COUNSEL FOR LAVAR D.: It is *Bruton.*

COUNSEL FOR NAKITA M.: It is *Bruton,* Your Honor.

---

**2.** *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

THE COURT: [Counsel for Lavar D.], see this? I've determined this isn't a *Bruton* situation....

\* \* \*

The State then again attempted to play the tape, and offered to the court what was marked for identification as State's Exhibit # 2, a copy of a transcript of the tape-recorded interview, prepared by the State, with redactions. Counsel for Lavar D. objected, and the following transpired.

COUNSEL FOR LAVAR D.: This is the [c]ourt redacting *Bruton* issues and it is not appropriate. I mean the State's Attorney's Office. The State's Attorney's Office is not a licensed, certified transcription. We don't know if they've transcribed out any exculpatory evidence. This is not a solution to get rid of the *Bruton* issues which are the implication by certain respondents of other respondents. It is not appropriate. I suggested it at the arraignment. I have suggested it at every single hearing since because severance of the trials is the remedy.

THE COURT: [Counsel for Lavar D.], and you didn't get severance of trials, okay? So that horse is dead. Subject to the motion. Thank you. Continue.

\* \* \*

COUNSEL FOR NAKITA M.: ... [W]hat the State has requested be introduced was transcribed by a person in the State's Attorney's Office. I would ask that it not be introduced into evidence.

\* \* \*

THE COURT: I haven't looked at the transcript....

\* \* \*

(Whereupon, a taped interview was played for the [c]ourt.)

\* \* \*

During the playing of the tape, counsel again objected to the State's starting and stopping of the tape, and the following transpired, in pertinent part.

COUNSEL FOR LAVAR D.: [T]his is [the State's] version of the tape. And that's where they're stopping and start-

ing.... The evidence is the tape in its entirety. The evidence, if it has *Bruton* issues, should have been severed. The State doesn't get to come in here and stop and start like this. Just like everyone said and then put it down on what they're claiming is some sort of official transcript which they typed up in their office based on their version of things.

\* \* \*

THE COURT: But didn't you get [the State's redactions]?

COUNSEL FOR NAKITA M.: I got it.

\* \* \*

COUNSEL FOR NAKITA M.: ... [B]ut in redacting it for the purpose of the motion ... why stop it and start it, stop it and start it. You're talking about voluntariness, stop it and start it. Who's to say that one of the parts that you missed—

THE COURT: Oh, I thought the only part, when you said play the whole thing I then said play the whole thing with the exception of the part that they said they could redact which incriminates other people.

\* \* \*

THE COURT: I mean, well not redact but skip over.

\* \* \*

THE STATE: I presented to counsel each of the set of statements. I told them that they had been redacted by *Bruton*.

\* \* \*

COUNSEL FOR LAVAR D.: I don't want their version of events. I want the tape.

\* \* \*

THE COURT: But you got the tape.

\* \* \*

THE COURT: But when you've got the tape, you can do your own version.

COUNSEL FOR LAVAR D.: Then I want my whole tape played, every single bit.

THE COURT: Then when we come to your tape. Anything else?

COUNSEL FOR SHAMIRA B.: Your Honor, I just want to note, if I may, the continuing objection to the stopping and starting and the redaction of the tape.

\* \* \*

Over continuous objections, the taped interview was played, with the State skipping portions of it. At some point, counsel for Shamira B. objected again on the basis that "[t]here were so many people [in Nakita M.'s tape-recorded statement] about corespondents...." Subsequently, a bench conference was held, and the following transpired, in relevant part.

COUNSEL FOR SHAMIRA B.: Your Honor, the statement I'm objecting to....

\* \* \*

COUNSEL FOR SHAMIRA B.: "I don't know," in response to a question "who kicked the young lady." That was played in open court. Your Honor heard it. I object to it on grounds of *Bruton* and I move for a mistrial.

THE COURT: Yeah, but it doesn't identify anybody.

\* \* \*

THE COURT: How's that *Bruton* if it doesn't identify anyone?

COUNSEL FOR SHAMIRA B.: Your Honor, we're in a corespondent case. She's talk[ing], she's giving direct testimony about other people involved in the assault.

THE COURT: But she doesn't identify anybody.

\* \* \*

COUNSEL FOR SHAMIRA B.: Your Honor, think the [c]ourt can reasonably infer in a co-respondent case like this—

THE COURT: No,—

COUNSEL FOR LAVAR D.: There were 35, 40 people on the bus—

\* \* \*

THE COURT: As a matter of fact, I've done cases involving barroom brawls, counsel, where there's a hundred people fighting. That doesn't say anything. That's not *Bruton.*

* * *

Counsel for several of the other appellants also noted continuing objections.

After appellants' objections were overruled, the State attempted to continue playing the tape; however, counsel for Shamira B. again objected stating that "[w]hen they refer to other co-respondents to the extent that it corroborates what witness testimony against the co-respondent is a *Bruton* issue—." The court again noted the continuing objections, and denied Shamira B.'s motion. Nevertheless, as the tape was played again, counsel for Shamira B. again objected, and the following ensued.

COUNSEL FOR SHAMIRA B.: Early in the interview [of Nakita M.], Detective Fleming asks Ms. M. about her and the other people who are being detained's involvement, in this particular line at the end of the tape—

* * *

COUNSEL FOR SHAMIRA B.:—Detective Fleming states "why didn't ya'll, why didn't anybody beat him up?" [Nakita M.] testified on the tape, it was just played in open court, they did beat him up. It doesn't get any more incriminating than that, Your Honor. It doesn't get any more prejudicial. I raise the same objection—

* * *

COUNSEL FOR SHAMIRA B.:—and move for a mistrial.

THE COURT: And it's noted. It still doesn't identify anybody. It doesn't say who "they" are.

COUNSEL FOR SHAMIRA B.: Your Honor, earlier in the tape, they're talking about Ms. M. and the other people that are detained in the same building. My point is that the [c]ourt can make a reasonable inference, the trier of fact can

make a reasonable inference from that that Detective Fleming is referring to the other people being detained—

* * *

THE STATE: I don't think that this is a *Bruton* issue. I think that what is said is so general, there's a Southern expression of "you all" and I think that, in an abundance of caution I tried to take everything out that's *Bruton* related. I do not think this is *Bruton* material.

THE COURT: I don't think it is either.

* * *

THE COURT: I don't know who it relates to.

* * *

On February 4, 2008, during a continuation of the pretrial motions hearing, after more discussion with respect to the tape-recorded statements, the court ordered that the recordings be transcribed and certified by a court reporter. The State then asked the court to have appellants' counsel review the tape-recordings and transcripts for Bruton issues, so that any problems in that regard could be resolved before trial. The court responded that counsel should resolve *Bruton* issues, and "[m]ake sure they're appropriately redacted to [appellants' counsel's] satisfaction, for your client. . . ." Counsel for one of the appellants responded that "[t]hey shouldn't be redacted . . .," and the following transpired.

THE STATE: [T]hey claim they shouldn't be redacted, and I disagree. That they are redacted for *Bruton* purposes. They can't claim that they shouldn't be redacted for *Bruton* and then come back on appeal and say, well, the [c]ourt—

THE COURT: I agree.

THE STATE:—was prejudice[d], because they weren't redacted. [Counsel for Lavar D.] has been saying, well, the State can't redact for *Bruton*. Well, the State can redact for *Bruton*, it must redact for *Bruton*, and that's what the Supreme Court has said that it is. I have given them copies [of the transcripts]. I have asked for their cooperation, Your Honor, and I'm not getting it to the degree as to what's *Bruton* or not.

\* \* \*

THE COURT: (indiscernible) see—here's—yeah. You all, whatever you all get should be everything. You all, whatever you all get should be everything. What the [c]ourt gets should not be everything. So they should redact, so that I'm not—your clients aren't implicated by what's in a statement of somebody else. That's the *Bruton* redact.

\* \* \*

On February 7, 2008, during a further continuation of the pretrial motions' hearing, the court verified that counsel had done the "*Bruton* redactions," and verified that the "redactions are both satisfactory to the State and the Defense. . . ." Both the State and counsel for each appellant responded in the affirmative, the agreed upon transcripts of the tape-recordings were received by the court, and several of the tape-recordings were played for the court. Of particular relevance is a portion of the December 4, 2007 statement of Ronald B. during an interview by an MTA detective, Detective Sergeant Kenneth Combs, which follows.

SGT. COMBS: You understand something. It's on video and there's witnesses. And then you go to court lying to me about what happened.

[RONALD B.]: I don't know (INAUDIBLE)

SGT. COMBS: Help yourself cause I guarantee you out of that group out there, nine people, four of them are going to tell me exactly what happened and exactly what you did then what are you going to do? Eighteen years I been doing this job. I know what I'm doing so now you can tell me the truth or we can put down what you just told me and we can go to court and say, not only did he lie[ ] about it and has no remorse over what he did at all. You understand what I'm saying? So what's the judge going to do at that point? He did it. I see he did it. I've got witnesses that say he did it and he going to sit there and lie about it and basically don't care that he did it.

[RONALD B.]: (Inaudible)

SGT. COMBS: Well then explain it to me. If these people did something to make you do this then you've got to explain that to me right now.

[RONALD B.]: Yeah, they was (INAUDIBLE)

SGT. COMBS: After now is too late.

[RONALD B.]: Huh?

SGT. COMBS: After now is going to be too late. So they were trying to do what? They tried to hit you, right?

[RONALD B.]: Yeah.

SGT. COMBS: And then what did you do?

[RONALD B.]: I hit them back.

SGT. COMBS: You hit them back?

[RONALD B.]: Yeah.

SGT. COMBS: Who did you hit?

[RONALD B.]: I think . . . I hit the girl.

SGT. COMBS: You hit the girl, okay. [Y]ou kick her?

[RONALD B.]: I don't think so.

SGT. COMBS: There was a whole group around you that started stomping on her.

[RONALD B.]: It was?

SGT. COMBS: Yes. And you were in that group, correct?

[RONALD B.]: Yes.

* * *

SGT. COMBS: Yes. So you kicked her?

[RONALD B.]: Yes.

SGT. COMBS: You hit her and you kicked her?

[RONALD B.]: No, I kicked her.

SGT. COMBS: Huh?

[RONALD B.]: I kicked her.

SGT. COMBS: You just kicked her when she was being held down outside the bus, right?

[RONALD B.]: Ah huh.

SGT. COMBS: Okay. Who else kicked her?

[RONALD B.]: I don't know.

* * *

SGT. COMBS: How many times did you kick her?

[RONALD B.]: Once.

* * *

On February 13, 2008, during a further continuation of the pretrial motions' hearing, counsel for Ronald B. argued that Ronald B.'s statement to police, as replicated above, should be suppressed as it was a product of police inducement. Counsel argued that the inducement was that "Ronald [B.] needs to confess before the other kids confess"; that he needed to "confess now—confess now before the other kids confess 'cause—and—because once the other kids confess I can't help you." The court denied Ronald B.'s motion to suppress, stating the following.

> THE COURT: There's another ... argument that was made that the [c]ourt will address and that is, that somehow ... Sgt. Combs, tricked or otherwise induced the respondent into making a statement by saying that he needed to help himself. In *In Re Lucas F*, as well as *Tobert versus State,* free and voluntariness is impacted on by whether or not the statement was extracted by threats or threats of violence, whether or not it was obtained by indirect or implied promises, or whether or not there was some exertion of improper influence. The [c]ourt is not satisfied that any of that's been shown.

The court also denied motions to suppress, on constitutional grounds, the statements of Shamira B., Wesley B., Lavar D., and Nakita M. The court granted Britny C.'s motion to suppress her statement.

On March 3, 2008, the adjudicatory proceedings began. The State called Sarah Kreager as its first witness. On direct-examination, Ms. Kreager testified as follows, in relevant part.

On the afternoon of December 4, 2007, at approximately

3:00 p.m., she and her "husband—boyfriend," [3] Troy Ennis, were at Chestnut Pharmacy in Hampden filling a prescription for Xanax for Ms. Kreager. Ms. Kreager also takes Paxil for anxiety and is on the "Methadone program" for an addiction to prescription painkillers. At the time, Ms. Kreager and Mr. Ennis, who had three children together, were living in a shelter because Mr. Ennis had lost his job. The children were not staying in the shelter, but were living with Ms. Kreager's mother.

After leaving the pharmacy, Ms. Kreager and Mr. Ennis decided to wait for the bus because it was a very cold day. She and Mr. Ennis, who was also on the "Methadone program," had to go get his medication after leaving the pharmacy.

When the bus arrived, Ms. Kreager and Mr. Ennis got on, using their "day pass." Ms. Kreager greeted the bus driver, and then turned to look for a seat to sit in. Ms. Kreager stated that the bus was very crowded and she noticed that there were a lot of students on the bus, so she proceeded to the back of the bus where there were two vacant seats together so that both she and Mr. Ennis could sit down. As Ms. Kreager sat down, Mr. Ennis told her that he would rather stand, as they did not have that far to go. Mr. Ennis also had a duffel bag with him, which he did not want to leave in the aisle because it may have "gotten in the . . . way for people to get through."

According to Ms. Kreager, the bus was loud and "students were laughing and carrying on," which was "the norm, when you would get on the bus at that time with students. . . ." When Ms. Kreager sat down, she "heard a voice from behind [her] and it said: This—that's my home girl's seat." Ms. Kreager turned to look and saw a girl whom she later identified as Nakita M. The girl told Ms. Kreager that she "needed to move." Ms. Kreager glanced around—thinking that she may possibly have taken someone's seat—to see if

---

**3.** Apparently, Ms. Kreager and Mr. Ennis are not legally married.

perhaps there was someone standing whom she had not noticed before. Ms. Kreager did not see anyone standing or waiting for the seat.

When Ms. Kreager realized that no one was waiting for the seat, she became confused, and she "almost was not sure if [Nakita M.] was even talking to [her], although she was looking dead at [her]." Ms. Kreager stated that she did not respond, but rather "kind of, shook [her] head as to not understanding and just turned around." As she did so, she heard giggling behind her, but she just "ignored it as children, juvenile." At that point, Ms. Kreager heard someone say, "If she doesn't want to move, we'll move that bitch." When Ms. Kreager heard that, she became alarmed because of the "tone of voice" and because of "the fact that something could be taken so serious [sic] to even call [her] that name." At that point, Ms. Kreager decided to go stand with Mr. Ennis, who was standing "down the steps right near the back . . . door" of the bus. When she reached Mr. Ennis, she told him "I believe these girls are trying to start something with me." Ms. Kreager said that she spoke in Mr. Ennis' ear because the "bus was kind of loud." Mr. Ennis responded to her, "Well, come up here with me. You know how kids are these days. Hayley [4] has more manners than they do." At that point, Nakita M. stood up, and in a raised voice, asked Mr. Ennis what he had said. Nakita M. turned to the back of the bus and said, "look, she has a little boyfriend with her," and "[y]ou white motherfuckers think you own shit. This is our bus." Ms. Kreager realized the situation was escalating, so she tried to dissolve it by saying, "Look, you can have the seat. It's not a big deal. Have the seat." Nakita M. did not sit down, however.

After that exchange, Ms. Kreager turned to Mr. Ennis because she wanted to tell him that she wanted to get off at the next stop, but as she went to face Mr. Ennis, Nakita M. swung at her, struck her in the face, and pulled her hair. Ms.

---

4. Hayley is the couple's five-year-old daughter.

Kreager stumbled backwards and her body twisted around, and Nakita M. was still trying to pull her by her hair. Ms. Kreager became nervous, and could hear uproar, noise, and commotion "coming from everywhere." She could hear someone yelling "[s]top" from the front of the bus. Nakita M. still had her by her hair, and another female came over and grabbed her by her hair as well. Both girls tried to pull Ms. Kreager by her hair into "that crowd that was beginning to get ... very anxious or excited; aggressive." At that point, Ms. Kreager felt someone grab her jacket and tug, and she realized that it was Mr. Ennis trying to pull her back. Mr. Ennis threw Ms. Kreager, who was on the ground on all fours, behind him. The crowd of students then began to "charge Mr. Ennis," and Ms. Kreager saw someone try to kick him in his face. Mr. Ennis began yelling to the bus driver to open the door.

When the bus door opened, Ms. Kreager crawled out "on all fours," and Mr. Ennis kicked the duffel bag out and told her to grab her purse. Once outside the bus, Mr. Ennis helped Ms. Kreager to her feet. Ms. Kreager stated that she "had chunks of hair falling out," and that she "was pulling [her] hair, trying to put [her] hair back up." Ms. Kreager was expecting the bus to pull away, but instead, she saw the group of kids moving towards the front of the bus. Mr. Ennis attempted to hold the bus doors closed, but there were students pushing through the door. The students were climbing over a bus passenger in a wheelchair to get to the front of the bus. After the bus doors "burst out," a large group of 20 to 30 students got off the bus and a group of approximately 7 to 12 of them "began circling" her. Ms. Kreager did not know where Mr. Ennis was at that point.

At some point, Ms. Kreager was facing Nakita M., and Nakita M. had "some sort of weapon in her hand." Ms. Kreager thought it was a nail file. Nakita M. kept asking Ms. Kreager, "what's good? What's good?" Ms. Kreager was becoming nervous and realized that she was going to be attacked.

Ms. Kreager testified that she was struck in the back of her head, and as she turned around, saw that it was a male who had struck her with a closed fist. She was then "charged" and "tackled" by Nakita M. and another female. Ms. Kreager fell to the ground and felt someone, whom she believed to be the male that had struck her in her head, on her side. Ms. Kreager stated that she ended up on the ground in the gutter with her hands covering her face and her body "tuck[ed] into a ball," "trying to block the punches and the kicks that were coming around" her. She then felt a piercing in her head. Ms. Kreager described the attack as follows:

I felt kicking in my ribs. I felt piercing over and over in my head. I could feels fists, being hit in my head. I could feel kicks in my back, all over my body, over and over and over. There was, you know, no stop, no pause, and they were getting harder and harder. And I felt more and more, which, I felt as though more people were coming over, because I could—at that time—as progressed, you would feel more kicks. You know, as I went up to feeling kicks or hits in my ribs, by the end I was feeling double of that amount. I just felt that there was more people over there.

* * *

At that point, I felt someone try to pull my hair—pull me by my hair and lift my head up, and I was trying to fight by keeping my head down and resisting—trying to resist that. I felt someone else grab the other side of my hair and they lifted my hair up.

And, when my hair was lifted up, I looked up. I could see a male with boots on. I want to say, like, a butter colored boot, jeans, green jacket. As I started to look up at him, I heard a female behind me say: Kick that—kick that bitch. And then the male kicked me in my eye, which immediately was excruciating pain. I could feel something almost crack or crunch in my eye, and my eye immediately swelled shut. So, I could not—I could not open my eye. I was almost scared that I may have lost an eye, because I couldn't see. I just—everything went black—everything.

Ms. Kreager believed that the voice she heard saying "kick that bitch" was that of Nakita M. After Ms. Kreager was kicked in her eye, she began yelling "My eye. Stop, my eye. Please stop." Ms. Kreager then heard a woman's voice say, "Stop; that is a woman you are hitting. You're going to kill her, you animals." Ms. Kreager did not know where the woman came from because she was on the ground; she could only hear her voice. Ms. Kreager also heard the woman, later identified as Joyce King, say that she was going to call the police, at which point the students got off of Ms. Kreager and ran.

Ms. Kreager stated that there was blood coming from her nose and her eye. Ms. Kreager testified that her eye had "swelled shut" and that it "gave her sharp pains in [her] head and eye, sinus pain immediately." It also caused her "nose to bleed" and she "was in a lot of pain. . . ." Ms. King helped Ms. Kreager up, and told her that she had called the police. Mr. Ennis came over to where Ms. Kreager was, and told her that "[t]hey got [him] on the other side of the bus."

When the police arrived, Mr. Ennis and Ms. Kreager pointed out her eye injury, and told the officer that some of the students were still standing on the corner. Other students had apparently kept running.

Ms. Kreager was transported by ambulance to Sinai Hospital. She stated that in addition to her eye injury, she was also "very sore," and had "approximately four to five stab wounds in the top of [her] head. . . ." Ms. Kreager stated that before the attack on the bus, her eye was "normal," and she did not have any other injuries on her body.

Ms. Kreager was at Sinai for about 7 or 8 hours before returning to the shelter. About 2 or 3 hours later, however, she became nauseous and began throwing up blood. The shelter workers called 911 and Ms. Kreager was transported to the emergency room at Johns Hopkins, and subsequently upstairs to the Wilmer Eye Clinic. Ms. Kreager obtained a prescription for an antibiotic and for a painkiller, and was released from the hospital.

During cross-examination by counsel for Ronald B., the following transpired, in relevant part.

COUNSEL FOR RONALD B.: Now, Ms.—this—you—you've made a victim impact statement[5] previously, have you not?

MS. KREAGER: Yes, sir.

COUNSEL FOR RONALD B.: And, in that victim impact statement, you indicated that this incident was part of the incident [sic] keeping you from your kids?

MS. KREAGER: Yes sir; it is—

COUNSEL FOR RONALD B.: Okay.

MS. KREAGER:—(continuing) prolonging.

COUNSEL FOR RONALD B.: When were your kids last in your custody?

* * *

MS. KREAGER: Currently, sir?

COUNSEL FOR RONALD B.: Yes.

MS. KREAGER: They're with foster, sir—foster care.

---

**5.** On February 21, 2008, a disposition hearing was held with respect to Shamira B., a co-respondent. At that hearing, Shamira B. pled "involved," and, apparently, Ms. Kreager made a victim impact statement. A transcript of that hearing, or of the victim impact statement, was not provided below or to this Court.

As we shall discuss in more detail in our "Discussion" section with respect to issue #2, in their brief, appellants direct us to counsel's proffer during the March 3, 2008 proceedings, that Ms. Kreager had testified at the February 21, 2008 disposition hearing, that the reason "'she has been [un]able to get her children out [of foster care] is because of [this] incident,'" which opened the door for appellants to "explore the veracity of that statement," and to offer another reason why Ms. Kreager did not have custody of her children, namely, that on October 18, 2007, she had been arrested for selling drugs to an undercover officer with her three children present. Appellants also ask us to take notice of a published newspaper account of Shamira B.'s disposition hearing, which report provided that "'Kreager said she remains separated from her three children, all under age 5, and did not want to reunite with them until after the trial was finished.'" Appellants also ask us to take notice of a district court case involving a charge against Ms. Kreager for distribution of narcotics.

COUNSEL FOR RONALD B.: Uh-huh. Didn't at one point, your mother file for custody of the children?

THE STATE: Objection, Your Honor—

THE COURT: Sustained.

THE STATE:—(continuing) and ask to approach.

\* \* \*

(Whereupon, counsel approached the bench and the following occurred:) [6]

\* \* \*

THE STATE: Your Honor, I move that all additional questions on this topic be stricken.

\* \* \*

THE STATE: It ... goes to areas that are irrelevant and immaterial. Counsel is trying to slime the—the witness on the stand—not in terms of credibility, but just in terms to be able to say: Well, she's a lousy mother. She doesn't have her kids. Therefore, don't believe her.

\* \* \*

COUNSEL FOR RONALD B.:—(continuing) her testimony in the victim impact was that this incident is the reason she doesn't have the kids. Your Honor, if there's some other reason she doesn't have her kids and she wasn't completely honest with this [c]ourt when she gave her victim impact study, how do we believe her now?

\* \* \*

---

6. Appellants assert that the issue raised with respect to this colloquy, specifically # 2, above, is preserved as to all appellants even though only counsel for Ronald B. questioned Ms. Kreager on this issue. Appellants assert that "it should be noted that counsel for Lavar D. participated in the bench conference as to this issue, as did unidentified Female Voice # 1," which voice "very well may have been the unidentified female speaker participating in the colloquy (as all other defense counsel, including all other female attorneys, are noted as participating.") Because of our disposition of this issue, it is of no moment whether the issue was preserved as to one or all appellants.

COUNSEL FOR RONALD B.: . . . [I]f she was dishonest in the victim impact statement before you a couple days ago, how can you be sure that her testimony today—

THE COURT: She was dishonest?

\* \* \*

COUNSEL FOR NAKITA M.: There was a statement that was made during the victim impact statement regarding reunification of her kids. Also, Your Honor, today, the State has opened the door regarding her pending case. So, we have questions about that and that is—

THE COURT: Well, you're not there. This—

COUNSEL FOR NAKITA M.: I understand that, Your Honor; but that—they're—they are—there's information in that particular case, as well that—that would regard questions regarding her children, as well. And, that would limit counsel's questions. And, the State opened the door for that, Your Honor. We didn't open the door. Ms. Kreager opened the door when she mentioned reunification of her kids last week during the Shamira B. victim impact statement. She opened the door.

And, earlier, on direct she said that her kids were—she took her kids with her mother. Now, she's telling us that the kids are in foster care.

COUNSEL FOR RONALD B.: And, the reason is not because of this case.

COUNSEL FOR NAKITA B.: Which then goes to her character in general, that we get to ask her questions about.

COUNSEL FOR RONALD B.: It goes to honesty.

\* \* \*

COUNSEL FOR WESLEY B.: I was present during the victim impact statement to Shamira B., and I'll proffer to the [c]ourt that that's exactly what Ms. Kreager said; the reason that she has [sic] been able to get her children out is because of her [sic] incident; and that she plans to reunite with them after the trial is complete; that said directly to Your Honor. You should be able to—we shouldn't have to

accept that at face value. We should be able to question her about that.

* * *

COUNSEL FOR WESLEY B.: We have evidence that that's not the facts. That's not the case. Our information is that that's not accurate.

* * *

THE COURT: And—and I guess my response is, even assuming what you say is true, what's that got to do with anything?

COUNSEL FOR WESLEY B.: It goes to credibility, Your Honor.

* * *

COUNSEL FOR WESLEY B.: A prior instance—opportunity she had to address the [c]ourt, she lied.

COUNSEL FOR NAKITA M.: And, on direct testimony by the State, Your Honor, she didn't tell the truth.

* * *

COUNSEL FOR NAKITA M.: And, they opened the door. That's the most important thing, Your Honor. We had agreed; but they opened the door in both cases today and during the victim impact statement.

THE COURT: I'll give you three more questions, and then move on.

* * *

(Whereupon counsel returned to their trial tables and the following occurred:)

COUNSEL FOR RONALD B.: Why are your children in foster care?

* * *

MS. KREAGER: Because I'm actually going through some hardship at the time. I'm homeless, sir.

COUNSEL FOR RONALD B.: It had nothing to do with the fact that, on October 18, 2007, you were—

THE STATE: Objection, Your Honor.

\* \* \*

THE COURT: Sustained.

\* \* \*

COUNSEL FOR RONALD B.: With all respect, Your Honor—

THE COURT: Well, if—if you're—if it goes to anything other than impeachables, sustained.

COUNSEL FOR RONALD B.: It—

THE COURT: No, because arrests are not impeachables.

\* \* \*

COUNSEL FOR RONALD B.: Yes, Your Honor, Thank you.

\* \* \*

COUNSEL FOR RONALD B.: On October 18, 2007, where were you?

THE STATE: Objection.... It's irrelevant.

THE COURT: What's that got to do with anything, [counsel for Ronald B.]?

COUNSEL FOR RONALD B.: Your Honor, she just testified that she doesn't have her kids because she's homeless.

THE COURT: Okay.

\* \* \*

COUNSEL FOR RONALD B.: I would like to ask her about the events of October 8th....

THE COURT: And, I'll say; Sustained. Next question?

\* \* \*

[During a bench conference, the following occurred].

COUNSEL FOR RONALD B.: She was arrested selling drugs to an undercover officer with three children present.

\* \* \*

THE COURT: So what?

\* \* \*

THE COURT: That's not an impeachable.

\* \* \*

COUNSEL FOR RONALD B.: But, it goes to credibility as to why—

THE COURT: That is not an impeachable.

COUNSEL FOR RONALD B.: Thank you, Your Honor.

\* \* \*

The following day, during a continuation of cross-examination, counsel for Wesley B. asked Ms. Kreager whether her testimony was that she did not have any pre-existing injuries prior to the incident, to which Ms. Kreager responded that she did not have any "black eyes, stab marks," bruising, or abrasions prior to the incident. Counsel for Wesley B. also asked the court to reconsider its ruling that counsel could not question Ms. Kreager as to the alleged incident on October 18, 2007, arguing that an arrest was probative as to Ms. Kreager's veracity. The court again refused to allow cross-examination in that regard. Counsel for Nakita M. asked Ms. Kreager whether her eye was "purple" when she got on the bus that day, to which Ms. Kreager responded that it was not.

On redirect-examination, the State asked Ms. Kreager whether she had a black eye before boarding the bus, and Ms. Kreager responded that she did not. The State also asked Ms. Kreager whether "anyone [had] attack[ed][her] or punch[ed][her] before the December 4th attack on the bus," to which Ms. Kreager responded, "No, ma'am." On recross-examination, counsel for Wesley B. asked whether "Mr. Ennis [had] ever struck [her] prior to December 4th?" The State objected to the question, and the court sustained the objection.

Dr. Mahajabin Ali, an emergency room physician at Sinai Hospital, testified to the following, in relevant part.

Dr. Ali attended to Ms. Kreager in the emergency room. After receiving a call from paramedics, Dr. Ali and her staff "prepared to take care of a trauma patient," as the paramedics had "designated that this patient had the potential for serious life threatening injury. . . ." When Dr. Ali first made contact with Ms. Kreager, Ms. Kreager was "extremely anxious and agitated," and she had a "very significant injury" to the area surrounding her left eye. Dr. Ali stated that Ms. Kreager's

eye was "markedly swollen and she had great difficulty opening it," and that there was also "marked tenderness." Over the course of a few hours, while Ms. Kreager was in the emergency room, her eye developed increased "echimosis, or bruising . . . ."

According to Dr. Ali, Ms. Kreager stated that "she had been kicked and punched and, in particular, that no objects had been used." A CT scan of Ms. Kreager's face "indicated that she did, indeed, have quite a severe injury to the eye with the potential for loss of vision." Those injuries included "multiple orbital fractures," "entrapment of the inferior rectus muscle," and an "intraocular hemorrhage." Dr. Ali could not determine by looking at the scan how old the fractures were, and could not determine whether Ms. Kreager's eye injury was pre-existing, or whether it was possibly obtained prior to December 4. Dr. Ali did not find "any physical signs," however, that "indicated that the injury was older than reported by" Ms. Kreager, and stated that it was "unlikely" that the bruising around Ms. Kreager's eye occurred three days prior. An examination of Ms. Kreager also revealed lacerations on her scalp. No internal injuries were noted.

Dr. Ali testified that Ms. Kreager was "anxious, agitated, and uncooperative," but that the administration of pain medication caused her to be less so. This was not significant to Dr. Ali, because, according to Dr. Ali, while Ms. Kreager was initially exhibiting "drug seeking behavior," after "further exam and getting the results of her CT scan [Ms. Kreager] did, in fact, have a painful injury."

Troy Ennis testified as follows, in pertinent part.

On December 4th, he and Ms. Kreager boarded the MTA bus after leaving a pharmacy. The bus was "rowdy" and "people were screaming and yelling." Mr. Ennis stood by the back of the bus, and Ms. Kreager also went towards the back of the bus. Shortly after they got on the bus, Ms. Kreager came to Mr. Ennis and whispered in his ear, telling him that "[t]hese girls in the back are trying to start with me over a seat." Mr. Ennis looked to where the girls were sitting and

"they were looking at [him], like, laughing and smiling. . . ." Mr. Ennis told Ms. Kreager, "My daughter has more manners than they do." At that point, a "heavyset girl jumped up and said, like, what the . . . hell did you say, or something like that and started screaming in [Ms. Kreager's] face." The girl was yelling in Ms. Kreager's face and another girl, who was wearing glasses, came up behind her. Ms. Kreager turned her head away and the "heavy set girl" took a swing at her. Another girl grabbed Ms. Kreager's hair and tried to pull her towards the back of the bus.

While the girls were trying to hit Ms. Kreager, Mr. Ennis grabbed her by her jacket and "threw her behind" him. At that point, "pretty much the whole front of the bus and the back of the bus, everybody just came towards where" Ms. Kreager and Mr. Ennis were to "try to . . . bum rush [them]." The crowd began kicking Mr. Ennis while he "balled up" to try to protect himself. Ms. Kreager was still behind him, and he was covering her. Mr. Ennis yelled for the bus driver to let them out, and was able to push open the doors. He grabbed Ms. Kreager, her purse, and his duffel bag, and they got off of the bus.

After they got off of the bus, Ms. Kreager began pulling the loose hair out of her head, saying that she "couldn't believe what happened over a seat." Mr. Ennis noticed people running towards the front of the bus, and he ran to the bus doors to try to hold them shut. Ms. Kreager told Mr. Ennis to let go of the doors, and when he did, the doors came open and people came out. Three or four people "came towards" Mr. Ennis, "trying to fight" him. They were swinging at him and kicking at him. Somebody tackled Mr. Ennis, and he "balled up" on the ground. There were five or six males trying to kick Mr. Ennis.

While Mr. Ennis was on the ground, he could see six or seven people "over top" of Ms. Kreager, kicking her. At that point, "[s]ome lady came out of the house yelling," telling the kids to "[g]et off that girl. That's a woman you're beating,"

and stating that she had called the police. Mr. Ennis stated that the kids began running away towards the corner.

After the kids ran away, the lady helped Ms. Kreager out of the gutter. Mr. Ennis testified that Ms. Kreager's "eye was bad," "her nose was bleeding and she was bleeding from her head." Soon after, the police arrived and Mr. Ennis told them what had happened. According to Mr. Ennis the inside of the bus was "beat up," the "front of the seats were loose," and a "couple of the windows were ... like, flapping." He stated that the bus did not look that way when he boarded it.

Mr. Ennis could still see the kids, who were "[j]ust at the next corner," and he pointed them out to an officer who "got in his car and went down there." Shortly thereafter, officers took Mr. Ennis and the bus driver to the location where the kids were to identify the attackers. Out of 15 or 16 kids who the officers had sitting on the ground, Mr. Ennis "picked the kids out who assaulted [him] or who [he saw] assaulting" Ms. Kreager.

On cross-examination, counsel for Ronald B. asked Mr. Ennis whether he had ever used the name "Troy Stinson" [7] before, to which Mr. Ennis responded, "No, I haven't." Counsel then asked Mr. Ennis whether he was "familiar with where [he was] on ... October 18, 2007?" During a subsequent bench conference, counsel told the court that he had "information" that Mr. Ennis had "identified himself as Troy Stinson on a previous date," and that he was attempting to rebut Mr. Ennis's testimony that he had never used that alias before. After the court told counsel to lay a foundation for the line of questioning he was pursuing, the following ensued.

COUNSEL FOR RONALD B.: On the date of October 18, 2007 did you have any contact with the Baltimore City Police Department?

THE STATE: Objection.

THE COURT: Overruled.

MR. ENNIS: I don't remember.

---

7. "Stinson" is sometimes spelled "Stenson" in the record.

COUNSEL FOR RONALD B.: You believe that—during the month of October, do you remember having any contact with any member of [the] Baltimore City Police Department?

THE STATE: Objection.

MR. ENNIS: No, I don't remember.

COUNSEL FOR RONALD B.: Do you believe your memory can be refreshed?

MR. ENNIS: Yes.

COUNSEL FOR RONALD B.: I'll show you what's been marked as Respondent's Exhibit No. 2. I don't want you to read it out loud.

THE COURT: No, you can't [use] a document he didn't prepare to refresh his recollection.

COUNSEL FOR RONALD B.: Isn't it true that on October 18, 2007 when Ms. Kreager was arrested—

THE STATE: Objection.

THE COURT: Sustained. Stricken.

* * *

After abandoning that line of questioning, counsel for Ronald B. asked Mr. Ennis about his relationship with Ms. Kreager. The following transpired, in relevant part.

COUNSEL FOR RONALD B.: Have you ever assaulted Ms. Kreager?

* * *

THE STATE: Objection.

THE COURT: Sustained.

* * *

COUNSEL FOR LAVAR D.: In the month prior to this incident, did you strike Ms. Kreager?

MR. ENNIS: No, I didn't.

THE STATE: Objection.

THE COURT: Sustained.

COUNSEL FOR LAVAR D.: So, your testimony is that your relationship with Ms. Kreager is a peaceful one?

MR. ENNIS: Yes.

THE STATE: Objection, it's not his testimony.

THE COURT: Sustained. He didn't testify anything, so how can his testimony be that if he—he hasn't—

COUNSEL FOR LAVAR D.: Is your relationship with Ms. Kreager a peaceful one?

THE STATE: Objection.

THE COURT: Overruled.

MR. ENNIS: Yes, it is.

COUNSEL FOR LAVAR D.: It is? Isn't it true, sir, that in 2006—in 2000—and I'll give you the exact date—

* * *

COUNSEL FOR LAVAR D.: I believe the exact date is in November 28th—almost December of 2000 you were convicted of deadly weapon with the intent to injure Ms. Kreager?

THE STATE: Objection.

THE COURT: Sustained.

COUNSEL FOR LAVAR D.: Okay, have you ever attended—and isn't it true that you have attended a program at the House of Ruth? [8]

THE STATE: Objection.

THE COURT: Sustained.

COUNSEL FOR LAVAR D.: Within the last year have you been ordered to stay away from Ms. Kreager? [9]

THE STATE: Objection.

THE COURT: Sustained.

* * *

Mr. Ennis agreed that there were possibly 40 children on the bus on December 4th, and that he identified the ones who

---

8. As noted by appellants in their brief, The House of Ruth identifies itself as a center for battered women.

9. Appellants ask us to take judicial notice of a protective order filed by Ms. Kreager against Mr. Ennis, 8-days prior to this incident.

had attacked him and Ms. Kreager out of a group of approximately 12 to 15.

Mr. Ennis testified again that he had never used the alias "Troy Stinson." Mr. Ennis testified that he did not know a police officer named Andrew McCarty, and that he did not recall having any contact with any police officers that asked for his name in October, 2007. The court sustained further objections to the same or similar questions about Mr. Ennis's use of an alias as "asked and answered."

Joyce King testified as follows.

On December 4 at approximately 3:00 p.m., she was sitting at her dining room table when she heard a loud noise that caused her to look up. There is a bus stop outside of her dining room window. When Ms. King looked up, she saw a bus that had slammed into the curb and saw the back doors of the bus "fly open, and a girl," who she later identified as Ms. Kreager, "come flying out, and a whole bunch of kids came behind her." Ms. King thought there were approximately 15 to 20 students who got off of the bus behind Ms. Kreager. Ms. King then saw Ms. Kreager down on the ground, and "as she tried to get back up, they all started kicking and punching her. All the children came off the bus ... they just kicked and punched." According to Ms. King "[e]very body that jumped off [the] bus," was involved in hitting, punching, and kicking Ms. Kreager. Ms. King jumped out of her chair and ran outside. She saw Ms. Kreager struggling to get to her feet, and then saw her kicked again, "and she went down." Ms. King started screaming, "You're going to kill her. Leave her alone." Ms. Kreager tried to get up again, but "[e]veryone was around her" and they "kicked her across the rest of the sidewalk into the gutter." Ms. King did not see Ms. Kreager strike anybody. Ms. King ran over to where Ms. Kreager was and picked her up onto the curb. She then yelled for her daughter to call 911. While she was holding Ms. Kreager, she noticed that the "bus was rocking" violently. She thought that "there was something going on on the other side of the bus, but [she] couldn't see that." Ms. King thought

that there "was a riot on the bus because it was rocking so hard."

When Ms. King's daughter came back outside of the house and yelled out that the "police are on their way," the "kids start[ed] running. They got about halfway down the block and stopped. They started running again when the police started showing up."

Ms. King testified that there was also a man in a wheelchair, a man on a cell phone, the bus driver, and Mr. Ennis present at the scene. Ms. King stated that when she first came into contact with Ms. Kreager, her eye "looked like it had exploded," and she was "bleeding from the top of her head." Ms. King could not identify the children involved, and could not provide a description of them other than that they were "students and they were black."

Lieutenant Robert Rosendale, shift commander for the Northern District MTA Police, testified that when he arrived on the scene, Baltimore City officers already had a group of approximately 20 to 25 individuals seated on the ground. Shortly thereafter, Mr. Ennis and the bus driver were at the scene, and Lieutenant Rosendale asked them if they recognized anyone involved in the assault. Mr. Ennis and the bus driver identified nine suspects, six of whom were male. The other individuals were released.

Officer Larry Ball, with the MTA police, testified that when he arrived on the scene, there were six black male juveniles and three black female juveniles being detained.

Counsel for Lavar D. stipulated that an olive green jacket belonged to Lavar D.[10]

Detective Combs testified that nine individuals were brought to his office as part of the investigation, which he was supervising. Detective Combs learned during the investigation that one of the individuals involved in the incident had been wearing a green coat.

---

10. State's Exhibit # 27.

Detective Combs went to the hospital to interview Ms. Kreager after the incident. At that point, Ms. Kreager's eye was "swollen shut," but he did not believe that it was purple. A few days later, Detective Combs saw Ms. Kreager again, and "[a]round her eye was turning purple." Detective Combs did not note any injuries on any of the individuals who had been arrested.

Daniel Williams, the MTA bus driver, testified as follows, in pertinent part.

On December 4, he was driving a "school run," meaning he picked up children from Robert Poole Middle School. Prior to making the "school run," he conducted a "pre-trip" to make sure "all seats [were] normal, the mirrors sufficient. . . . No dents, no doors broken, anything like that. . . ." Prior to the "school run" nothing was broken on the bus.

At approximately 3:00 p.m., Mr. Williams picked up about 43 students from the middle school. At first, "it was a normal school ride." Subsequently, Mr. Williams picked up three more passengers: a female, a middle-aged male, and an elderly male. Mr. Williams stated that there were three empty seats on the bus, one of which "was the seat behind the back door where there was one girl kneeled over filing her nails that was taking up two seats." Mr. Williams described the girl as "brown skinned—dark skinned, kind of medium hair, hair went almost to her shoulder, kind of heavy set girl." According to Mr. Williams, the female passenger, who he identified as Ms. Kreager, "could not sit down because the student would not let her sit down." Mr. Williams did not notice anything unusual about Ms. Kreager's eye when she boarded the bus, and stated that it "[l]ooked fine." He also testified that Ms. Kreager and Mr. Ennis were not arguing when they got on the bus.

Mr. Williams heard the heavy-set girl tell Ms. Kreager, "you can't sit down," and heard the middle-aged male passenger, who he identified as Mr. Ennis, say "[l]eave my girlfriend alone." After hearing the exchange, Mr. Williams said, "[w]hy don't you leave the woman alone and let her have a seat?" He

then picked up a wheelchair passenger. After the passenger in the wheelchair boarded the bus, "it went crazy." According to Mr. Williams, Ms. Kreager and the "female that was filing her nails was screaming at each other," and then the "whole back of the bus jumped on" Ms. Kreager and Mr. Ennis. Mr. Williams did not hear any racial slurs and did not see Ms. Kreager spit on anyone. He also did not see Mr. Ennis with a knife. Mr. Williams estimated that "maybe thirty—twenty-six, thirty students had" Ms. Kreager and Mr. Ennis "at the back of the door." Mr. Williams characterized the noise level on the bus at the time that "the riot broke out" at "about a seven because the children in the front was not participating that much with the wildness going on in the rear." As soon as Mr. Williams stopped the bus, the "whole back door flung open . . . the left side of the door flung open" and Ms. Kreager and Mr. Ennis were "forced out on the ground being beaten, kicked, and stomped." Prior to being forced out of the bus, Mr. Williams observed the heavy set girl striking Ms. Kreager, and "then the other students followed."

Mr. Williams observed about six students around Mr. Ennis before he fell out of the back door. After Ms. Kreager and Mr. Ennis went out the back door, approximately 18–20 students also exited the back door and "they were beating [Ms. Kreager]. She was laying on the ground." Some students who could not get out the back door ran to the front of the bus and "started kicking the front door while [Mr. Ennis] was holding the front door trying to keep them inside the bus."

Mr. Williams helped the elderly man off of the bus, and as he was doing so he was kicked, pushed, and punched. When he got the elderly man off of the bus, he saw a male kicking Ms. Kreager in the face. Mr. Williams hollered to the students to "get off the woman, you gonna kill her," and then Ms. Kreager stood up with blood running down her face. Shortly thereafter, a woman came running out of a house near where the bus was parked, and a couple of minutes later, an ambulance arrived.

Mr. Williams stated that during the attack, he saw the girl who had been filing her nails on the bus hitting Ms. Kreager in the head constantly while a boy also hit her. Mr. Williams called 911 and the MTA for assistance, and identified his voice on a tape-recording stating that "these kids are going crazy." After the students "finished beating" Ms. Kreager and Mr. Ennis, they "walked down the street, strolled." Once the police arrived, they asked Mr. Williams and Mr. Ennis if they could identify any of the students involved in the attack. Mr. Williams "pointed to the ones" he knew, making a total of nine identifications. Mr. Williams stated that he was "[o]ne hundred percent" certain that he had identified the right individuals, and that he was so certain because "[i]t was devastating what happened on that coach. I'll never forget it."

Mr. Williams testified that after the incident, he noticed that one of the back windows of the bus was broken and the back door was broken. One of the front seats of the bus was also broken.

On March 11, 2008, during the continuation of the adjudicatory proceedings, counsel for the appellants stipulated to the admission of the transcripts of the tape-recorded interviews with the *Bruton* redactions. The relevant portions of the redacted transcripts follow.

### TAPED STATEMENT OF NAKITA M.

[NAKITA. M.]: We was on the school bus and everybody we was talking or whatever. So a white lady got—a white lady and her husband, or whoever he is to her, got on the bus. She had an attitude ... already peeped out she had an attitude with him and I was just looking. And that's when, when I was looking, she must have thought maybe I was looking at her or something and she whispered something in her boyfriend's ear. And then she was sitting down, and he said, "Well, spit on one of them B's then." So, I looked back at her and then I got up. As I was getting up to move back so wouldn't no spit get on me in case she do spit. She was spitting, she started spitting across the room. So the spit almost got on me, that's when I turned around

and she hauled off and banged me. So I started banging her back.

\* \* \*

[NAKITA M.]: When she got on the bus ... her eye was red and stuff. . . .

\* \* \*

FEMALE VOICE: You all got to fighting on the bus and then what happened?

[NAKITA M.]: She got off the bus.

\* \* \*

[NAKITA M.]: As they was getting off the bus the bus driver we was telling him to pull off but he ain't pull off. [T]he man got back on the bus with this knife talking about I'll stab any of you all niggers.

\* \* \*

FEMALE VOICE: Okay. So when you all were fighting the young lady, what was the man doing?

[NAKITA M.]: I was fighting [Ms. Kreager] first because she banged me. I was fighting her and [Mr. Ennis] was breaking it up. He broke it up, they got off the bus. . . . He gets back on the bus with a knife trying to stab some-body. . . .

\* \* \*

FEMALE VOICE: Who kicked [Ms. Kreager] in the face?

[NAKITA M.]: I didn't kick her.

FEMALE VOICE: I didn't say you kicked her. I said who kicked her in the face?

[NAKITA M.]: I don't know.

\* \* \*

[NAKITA M.]: I don't know who kicked her in the face, I only hit her with my hand.

\* \* \*

FEMALE VOICE: Who kicked [Ms. Kreager]?

[NAKITA M.]: I don't know. It was so many people on that lady I don't know.

\* \* \*

[NAKITA M.]: There was so many people on this lady, I don't know who kicked the lady.

FEMALE VOICE: Who held her hair?

[NAKITA M.]: I didn't have her hair, I was just banging her.

[Blanked out passage].

FEMALE VOICE: And who else?

[NAKITA M.]: (Inaudible) still out there fighting I got back on the bus and got my stuff. (Inaudible).

\* \* \*

FEMALE VOICE: Okay, now we got that part straight. She banged you first and then y'all start fighting, but you know who did it, you were right there.

[NAKITA M.]: I wasn't right there. There was a lot of people fighting this lady, I don't remember who kicked her. I don't know who kicked her.

[Blanked out passage].

\* \* \*

**MTA POLICE INTERVIEW OF [RONALD B.]**

[RONALD B.]: When we was riding on the bus ... it was a stop and [Ms. Kreager and Mr. Ennis] got on the bus....

\* \* \*

[RONALD B.]: [T]he girl when her eye was messed up and her eye was messed up and she start uh....

SGT. COMBS: Who's eye was messed up?

[RONALD B.]: The lady, the white lady.

SGT. COMBS: Okay.

[RONALD B.]: Her eye was messed up and she thought we was talking about them and that's when she started fussing.... Then um, she told her ... I don't know if that's her boyfriend or not; she told him something and he was like *"spit on them. Spit on them niggas."* [Emphasis in original].

\* \* \*

SGT. COMBS: Did the woman spit on [Nakita]?

[RONALD B.]: I don't know. I don't think she spit on her.

SGT. COMBS: So when you say they started fighting, what happened?

[RONALD B.]: I don't know.

\* \* \*

SGT. COMBS: The lady hit Nakita?

[RONALD B.]: Yes. Well I thought she hit her first.

\* \* \*

SGT. COMBS: So you didn't see it?

[RONALD B.]: No.

\* \* \*

[RONALD B.]: It was a whole lot of people on the bus so I couldn't really see.

\* \* \*

SGT. COMBS: What did you do?

[RONALD B.]: Nothing.

\* \* \*

**MTA POLICE INTERVIEW OF [LAVAR D.]**

SGT. WHITE: Um, Lavar I want you to briefly describe the event that happened today that led up to the aggravated assault.

[LAVAR D.]: The man ... and woman had got on the bus ....

\* \* \*

[LAVAR D.]: They were Caucasian. The lady was already mad at her husband....

SGT. WHITE: How could you tell?

\* \* \*

[LAVAR D.]: Cause she had got on the bus screaming all that other stuff but then that's when um, Nakita and them was talking on the bus and they wasn't talking to the lady but the lady thought they was talking to her so she told her husband something and her husband said "Spit in her face" and then Nakita walked up, got in the back of the bus so

she won't spit in her face then that's when the uh the lady had banged Nakita in her face and the man pulled out a knife.

SGT. WHITE: The lady went after Nakita and banged her in her face?

\* \* \*

[LAVAR D.]: Yeah and the lady she was still . . . the lady was mad and she just banged Nakita.

SGT. WHITE: She followed her to the back of the bus and banged her?

[LAVAR D.]: Yeah she followed her cause we was like where the doors, the back doors are at. Nakita got up and went all the way to the back. She got up and followed Nakita and banged her and that's when they got off the bus and the man pulled out the knife.

\* \* \*

SGT. WHITE: You didn't see anybody hitting or kicking on the lady?

[LAVAR D.]: Nah, I just told I saw a whole bunch of people.

\* \* \*

[LAVAR D.]: I got off the bus, walked off and that's when the police came and. . . .

SGT. WHITE: Who was with you when you got off the bus and walked off?

\* \* \*

[LAVAR D.]: Who was with me?

SGT. WHITE: Yeah.

[17 blanked out lines of colloquy between Sgt. White and Lavar D.]

SGT. WHITE: No. Let's be for real. What happened on there?

[LAVAR D.]: Just told you.

\* \* \*

[LAVAR D.]: I'm not lying. I was with a group of boys that had walked off and we ... we was walking ... we had got around there and every ... all I had seen was people running and then that's when they had caught everybody and made everybody sit down.

SGT. WHITE: They only caught nine people so what's going on?

[Lavar D.'s response blanked out].

\* \* \*

[LAVAR D.]: Man, it was some other girls that had hit that lady that aint get caught....

\* \* \*

SGT. WHITE: Who else didn't [get caught]?

[25 blanked out lines of colloquy between Sgt. White and Lavar D.]

\* \* \*

[87 blanked out lines of colloquy between Sgt. White and Lavar D.]

\* \* \*

[LAVAR D.]: ... I bet money if y'all look on that camera [that was on the bus] y'all see me.....

\* \* \*

[LAVAR D.]: sitting down.

\* \* \*

[LAVAR D.]: You probably do see me. I was on the bus.

\* \* \*

[LAVAR D.]: You probably see me but you aint going see me hitting nobody. I'm chilling on the chairs for real.

\* \* \*

SGT. WHITE: I don't know why you won't tell me who it is but it's okay cause I can guarantee you if one of them do ... people over there arguing right now is going to come back up in here and they going to say ...

[LAVAR D.]: They ain't going to say ... they aint going to say I did it.

SGT. WHITE: They going to say oh yeah Lavar got a couple of licks in too.

[LAVAR D.]: (INAUDIBLE)

SGT. WHITE: Don't believe that.

[19 blanked out lines of colloquy between Sgt. White and Lavar D.]

SGT. WHITE: Lavar, Lavar, Lavar. I'm going to stop the tape.... Is there anything that you would like to tell me that you haven't told me that can help me clear up the situation ...?

[LAVAR D.]: The main thing, I aint do nothing.

* * *

INTERVIEW RESUMES

[LAVAR D.]: At first I was on the bus. I got off the bus and then the bus driver started calling the police and I walked off. I saw a little bit of that fight but then I started to walk off.

LT. ROSENDALE: You didn't participate in the fight ...?

[LAVAR D.]: No.

* * *

LT. ROSENDALE: Do you know that somebody identified somebody in a green jacket?

[LAVAR D.]: No.

LT. ROSENDALE: What color is your jacket?

[LAVAR D.]: Green.

* * *

LT. ROSENDALE: Did you see him actually kick her?

[15 blanked out lines of colloquy between Sgt. White and Lavar D.]

**RECORDED INTERVIEW OF [WESLEY B.]**

[DET. SMITH]: There was a couple, male and a female. What do you think happened aboard that coach?

[WESLEY B.]: They got on the bus. The lady had an attitude. Looked like she already got beat up. She had a

black eye or something. And she whispering to a, some man. The man (inaudible) in his ear, and said spit on 'em.

\* \* \*

[Continuation of recorded interview of Wesley B.]

[WESLEY B.]: I hit the man two times. I didn't touch the lady. I just saw the lady on the ground.

[DET. SMITH]: Okay, and where did you strike him? Were you on the coach or off the coach at that time?

[WESLEY B.]: One time on the coach, one time off the coach.

\* \* \*

[DET. SMITH]: And why did you strike the man?

[WESLEY B.]: Because he told us, he told the lady to spit on us and he kept telling us to get out of the bus and fight.

\* \* \*

On March 11, 2008, the State rested its case. On March 13, 2008, appellants began their case, calling Officer Andrew McCarty as a witness. Officer McCarty testified that on October 18, 2007, he was working undercover looking for drug activity. In that capacity, he came into contact with an individual who identified himself as "Troy Stenson." He stated that the person identifying himself as "Troy Stenson" identified Ms. Kreager as his wife. Subsequently, the State and appellees agreed to a stipulation, namely that on October 18, 2007, Mr. Ennis gave the name "Troy Stenson" to a police officer.

Floyd Gross, Jr. testified to the following.

On December 4, 2007, at approximately 3:00 p.m., the bus driver, i.e., Mr. Williams, helped him[11] onto the bus, which was "full of school kids." When Mr. Gross got onto the bus, he noticed that "there was some commotion going on in the back of the bus," and that there was "a lot of confusion and people were running back and forth on the bus." Mr. Gross was facing forward, towards the front of the bus. He could

---

11. Mr. Gross uses a wheelchair.

not see what was happening in the back of the bus, and did not turn around to look in the back of the bus because he "don't turn around to [sic] good," but he could "hear the rumbling of what was going on," and noticed that the "bus driver . . . tried to get some . . . order on the bus by hollering to the back of the bus."

After the bus driver failed to get control over the commotion, Mr. Gross heard the "back door of the bus come open," and then the students who had been on the bus got off of the bus. Just prior to the back door being "kicked open," Mr. Gross heard "a white couple . . . saying that they was being attacked or being bothered by the students in the back of the bus . . . ." When the students got off of the bus, Mr. Gross observed "[a] white lady . . . outside the bus ranting and raving to one of the students that was on the bus." Mr. Gross did not notice anything unusual about the woman's face or eye.

Mr. Gross testified that about 5 or 6 children tried to get off the front of the bus, near where he was sitting, but that he put out his hand to keep them from passing him. One of the girls that he stopped, who he identified in court as Nakita M., told him that "the lady outside the window had spit on her." After Nakita M. told him that the lady outside of the bus had spit on her, the group "calmed down for a minute and the lady on the outside was still ranting and raving up at the bus." At that point, one of the group that he had stopped "reached across [him] and opened the window and said something to her." Mr. Gross stated that the lady outside "was the lady that . . . had gotten hurt," and that when she was outside of the bus, she had threatened the group inside the bus "by closing her hands in a balled fist," and "act[ing] like she wanted to fight them." The other people on the bus "were running back and forth on the bus" and there was "a lot of confusion." The group that Mr. Gross stopped got off of the bus at some point, but Mr. Gross did not "pay any attention" to where they had gone.

Mr. Gross stated that he did not see the "white man," who was with the lady outside of the bus, with a knife. He stated

that while the white man was on the bus, however, he "was saying that he was tousling with three to four kids in the back of the bus. That he held his own. And more like a boast or brag." He testified that after the bus driver helped him to get off of the bus, he saw the white woman, who showed him her eye. Mr. Gross stated that at that time, her eye was "swollen closed."

On cross-examination, Mr. Gross agreed that he did not remember Nakita M. saying anything about spitting until after he spoke to counsel for Nakita M.

Unique Curtis testified to the following, in pertinent part.

On December 4, 2007, at about 3:00 p.m., she was on the school bus coming from Robert Poole Middle School. While on the bus, Ms. Curtis observed a white woman and a white man board. The lady was walking in front of the man. According to Ms. Curtis, the woman sat down, and the man stood in the "back doorway" of the bus. Ms. Curtis noticed that the woman had a black eye. She testified that everyone on the bus "was laughing at her eye," and that the woman "got mad," and "[t]urned around, said something to Nakita." Nakita M. then "waved her off" and "got up to move." After Nakita M. got up, the woman whispered something in the man's ear, and the man "turned around and said, 'spit on those nigga's.'" Ms. Curtis described the subsequent events as follows.

> That's when Nakita was like, no ain't nobody going to spit on me, ain't nobody going to spit on me. The lady took off her book bag, was like don't talk to him like that, don't talk to him like that. And Nakita was like, well ain't nobody going to spit on me. That's when the white man was like, well I'll beat y'all ass. That word.
>
> * * *
>
> That's when the lady was, don't talk to him like that. And Nakita was like, well ain't nobody going to spit on me. That's when the lady banged Nakita.
>
> * * *

Ms. Curtis stated that after "the lady" struck Nakita M., Nakita M. "kind of stumbled down. Almost fell. And then somebody went over there and helped her up." After Nakita M. got up, she started fighting with "the lady," and "the man had grabbed the boy...." After the lady and the man began fighting with the kids, the bus driver started "fussing at them," and he "told them to get off the bus. That they shouldn't be fighting with no kids." At that point, the commotion moved to the front of the bus, although the man who was with the lady was still in the back of the bus. The man grabbed one of the boys off of the bus, "tying to beat him up," and "trying to shut his head in the back doors."

At some point, "the lady had got off the bus," and the bus driver shut the doors. The lady, who Ms. Curtis identified as Ms. Kreager, kept "banging on the bus," and yelling that she was going to call the police. The bus driver told the kids to get off of the bus. Ms. Curtis, Nakita M., and some others got off of the bus and started walking away down the street. Ms. Curtis did not see Nakita M. hit anyone when she got off of the bus.

Ms. Curtis stated that "everybody that was on the bus," "started walking down," but that "before [they] could hit the corner, the police came and ... told [them] all to sit down on the ground." Subsequently, the "bus driver and the lady boyfriend had came down and started pointing people out. Who they thought was in it, or who they said they seen was in it."

On cross-examination, Ms. Curtis created a diagram that indicated that Ronald B. and Britny C. were seated in the rear of the bus with Nakita M. and Ms. Kreager when the fighting occurred. Ms. Curtis could not remember where Lavar D. was sitting. Ms. Curtis also testified that while Nakita M. and Ms. Kreager were fighting, "the man" was "[s]winging on people," both girls and boys. Ms. Curtis did not see the man or the lady with a knife. She did remember a man in a wheelchair seated toward the front of the bus, and stated that she was directly behind Nakita M. when they went to get off

of the bus, but did not remember the man in the wheelchair putting out his hand to keep them from getting off of the bus. When they got off of the bus, Ms. Curtis saw Ms. Kreager sitting on the curb with another lady.

After Ms. Curtis's testimony, appellants rested. The State called Detective Smith as a rebuttal witness. Detective Smith testified that he was present during an interview of Mr. Gross on December 18. At that time, Mr. Gross did not say anything about trying to prevent anyone from getting off of the bus.

On March 18, 2008, closing arguments were presented, during which the State argued as follows, in pertinent part.

The culpability of [these] respondents rest[s] in the conspiracy theory and the fact that these respondents are co[-]conspirators. There's a meeting of the minds that Sarah Kre[a]ger and Mr. Ennis get beat up. And anyone participating in the conspiracy should be found facts sustained on each and every count, stemming from the original agreement.

Evidence shows that the assault started between Nakita and Sarah Kre[a]ger, while two other girls assisted Nakita. Mr. Ennis grabbed Ms. Kre[a]ger, Mr. Ennis pulled ... her behind him in an attempt to protect and defend her. The male students rose up against Mr. Ennis. The fight spilled out onto the street. The students damaged the bus in order to get at Ms. Kre[a]ger, Mr. Ennis or both.

\* \* \*

Every respondent sitting on the front bench, was identified as an active participant, a co-conspirator, and as such is guilty of ... or ... should be found facts sustained of every count charged.

The State relies on Grandison vs. State,[12] which holds as to conspiracy, where the existence of a conspiracy is established, the law imposes upon a conspirator, full responsibili-

---

12. 305 Md. 685, 506 A.2d 580, *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986).

ty for the logical and natural consequences of acts committed by his fellow conspirator if such acts are done in the pursuance in the common design or purpose of the conspiracy.

* * *

During his closing arguments, counsel for Ronald B. argued, in part, that the only "shred of evidence" that indicated that the students were involved in "any of the acts" on the bus, was Ronald B.'s statement to police, after he had been detained for hours and interrogated by Sergeant Combs, who had told Ronald B. to "help [himself], here's your way out," that he had hit Ms. Kreager.

During her closing arguments, counsel for Lavar D. argued, in part, that Lavar D. "denied all involvement in this offense, if [it's] an offense at all."

Counsel for Britny C. argued, in part, that there "is no evidence here linking Brittany [sic] C. to the assault on Sarah Kre[a]ger. None." Counsel continued that while Britny C. was on the bus, "possibly in the back, that fact was not enough to accuse her of assaulting Ms. Kre[a]ger, or conspiring with others to assault Ms. Kre[a]ger." Counsel argued that the only reason Britny C. was in court, was "because the driver of the bus pointed her out in a field identification."

Following closing arguments, the court announced its verdict, stating the following, in relevant part.

Before announcing the verdicts, or the decisions, findings with respect to the individual petitions, I'm going to set forth, what I believe is, the applicable law with respect to the various counts of the petition along with key provisions of Maryland law.

* * *

The court then set forth, in depth, the law with respect to first degree assault, second degree assault, reckless endangerment, conspiracy, disturbing the peace and disorderly conduct, and malicious destruction of property. The court also stated:

In terms of self defense, which has been raised in this case, [*Morris v. State*, 4 Md.App. 328, 242 A.2d 582 (1968)], the burden of proving self defense rest[s] upon the person accused of the assault. And then in [*Jacobs v. State*, 32 Md.App. 509, 363 A.2d 257 (1976)], the trier [of] fact has to determine whether or not the evidence is fairly been gen— the issue has been fairly generated in this case.

Gray vs. State, for Maryland App. 175, 1968 and Gorredo [Guerriero] vs. State, 213 Maryland 545[, 132 A.2d 466], a 1957 decision in a Court of Appeals says, it's for the trier of fact[ ] to determine whether the person accused of assault was justified in meeting force with force.

\* \* \*

No objections were raised at any time during the court's in depth review of the applicable law. Subsequently, with respect to Ronald B., the court found that the "evidence is sufficient to find facts sustained beyond a reasonable doubt" as to first and second degree assault, conspiracy to commit first degree assault, reckless endangerment of Ms. Kreager, and reckless endangerment of Mr. Ennis. With respect to Lavar D., the court found that the "evidence is sufficient to find facts sustained beyond a reasonable doubt" as to as to first and second degree assault, conspiracy to commit first degree assault, reckless endangerment of Ms. Kreager, and reckless endangerment of Mr. Ennis. With respect to Britny C., the court found that the "evidence is sufficient to find facts sustained beyond a reasonable doubt" as to first and second degree assault, conspiracy to commit first degree assault, and reckless endangerment of Ms. Kreager.

We shall incorporate additional facts as necessary in our discussion.

## Discussion

We shall address each argument, as presented by appellants, and set forth above.

### 1.

 Appellants' first contention is that the circuit court committed "fundamental and reversible error in shifting 'the burden of proving self defense [to] the person accused of the assault.'" Appellants point to the court's reference, during its review of the applicable law at the end of the proceedings, where it stated that the "burden of proving self defense rest[s] upon the person accused of the assault," and cited case law.

The State counters that appellants' argument "fails for lack of preservation and on the merits." With respect to lack of preservation, the State asserts that, "[n]otwithstanding the presence of six defense attorneys and three prosecutors, no objection was raised so that the court's reference could have been expanded or clarified. As such, [a]ppellants' contention on appeal was waived." The State continues that even if we should address the merits, "the record fails to support [a]ppellants' claim of error." The State avers that it "is not at all clear from the record that the court misunderstood the allocation of the burden of proving self-defense," and, in fact, a "fair reading of the record suggests that the court correctly set forth the allocation of the burden as to self-defense, but misspoke when it referred to the initial burden of producing evidence to generate the defense as the burden of proof." In any event, argues the State, any error would be harmless beyond a reasonable doubt, as "[o]f the three juveniles raising this contention on appeal, none would have been entitled to the self-defense defense," as there "was no evidence to suggest that any of the juveniles ... acted in self-defense."

This case was tried nonjury; thus, we review it on both the law and the evidence. Maryland Rule 8–131(c). We shall address the merits, and we agree with the State.

 As correctly noted by appellants, it is well settled in Maryland that where the defense of self-defense—which is a defense to the crime of assault, *see, e.g., Bryant v. State,* 83 Md.App. 237, 246, 574 A.2d 29 (1990) (noting that "the simple and frequently neglected truth is that the defense of self-defense applies to assaultive crimes generally")—is generated

in a case, the burden lies with the State to prove that the accused did not act in self-defense. *See Jacobs,* 32 Md.App. at 514, 363 A.2d 257 (holding "that where self-defense has been fairly generated by the evidence as an issue in the case, the burden is upon the State of negating such self-defense beyond a reasonable doubt as a necessary element of its proof of guilt."). It is equally well settled that the defendant bears the initial burden of producing "some evidence" sufficient to generate the defense of self-defense, although the evidentiary threshold necessary in that regard is minimal. In fact, "[i]f there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden." *Dykes v. State,* 319 Md. 206, 217, 571 A.2d 1251 (1990). Once the defendant has met the initial burden of producing evidence to generate the defense, "the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not [act] in self-defense." *Id.*

To reiterate, in this case, in setting forth the applicable law, the court stated:

> In terms of self defense, which has been raised in this case, [*Morris v. State,* 4 Md.App. 328, 242 A.2d 582 (1968)], the burden of proving self defense rest[s] upon the person accused of the assault. *And then* in [*Jacobs v. State,* 32 Md.App. 509, 363 A.2d 257 (1976)], the trier [of] fact has to determine whether or not the evidence is fairly been gen— the issue has been fairly generated in this case.

(Emphasis added).

The court then cited additional cases and stated: "[I]t's for the trier of fact[ ] to determine whether the person accused of assault was justified in meeting force with force."

Appellants take issue particularly with the court's first statement, i.e., that "the burden of proving self defense rest[s] upon the person accused of the assault," along with its cite to *Morris,* which held that the "burden of proving self-defense rested upon the appellant," but which was decided prior to

*Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), which held that a law requiring a defendant to establish that he acted in the heat of passion in order to reduce the homicide charge from murder to manslaughter, was unconstitutional. *Id.* at 704, 95 S.Ct. 1881. Following *Mullaney,* this Court noted that *Mullaney* applies to affirmative defenses generally, and that the State has the burden to negate the defense of self-defense beyond a reasonable doubt. *See, e.g., Evans v. State,* 28 Md.App. 640, 349 A.2d 300, (1975). Thus, argue appellants, "it is beyond cavil that the [c]ourt erroneously required the defense to prove the existence of self-defense."

We disagree with appellants' reading of the record. Instead, it appears that the court merely made a misstatement when it stated that "the burden of *proving* self defense rest[s] upon the person accused of the assault," instead meaning to say the burden of *production, i.e.,* the initial burden of producing evidence sufficient to generate the defense of self-defense, rests upon the person accused of the assault. This is bolstered by the fact that the court next states that it has to determine whether the issue of self-defense has been fairly generated by the evidence, and cites to *Jacobs,* which, as set forth above, held "that where self-defense has been fairly generated by the evidence as an issue in the case, the burden is upon the State of negating such self-defense beyond a reasonable doubt as a necessary element of its proof of guilt." *Id.,* 32 Md.App. at 514, 363 A.2d 257. The court continues that once the trier of fact determines whether the defense has been generated, it then has to determine whether the person accused of the assault was justified in using self-defense. Absent the apparent misstatement, the court correctly set forth the law as to self-defense. Moreover, in announcing the verdicts, the court stated, prior to each finding of "involved," that the "evidence is sufficient to find facts sustained beyond a reasonable doubt." Thus, the court was clearly aware of the burden of proof.

In any event, even if the court's misstatement could be considered error, we would nevertheless conclude that any

error was harmless beyond a reasonable doubt. *See Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976) (In a criminal context, an error is harmless if "a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict."). It is evident from the record that none of the appellants on appeal sought to prevail or could have prevailed on the defense of self-defense.

According to their statements, Lavar D. claimed that he was not involved in the assaults on either Ms. Kreager or Mr. Ennis, and that he remained on the bus during the attacks, and Ronald B. claimed that he "really couldn't see what happened" on the bus. Furthermore, during closing arguments, counsel for Britny C. and Lavar D. asserted that their clients denied all involvement in the attacks. Counsel for Ronald B. asserted that his client denied involvement, arguing instead, as he does again on appeal, that Ronald B.'s statement implicating himself was the product of police inducement.

### 2.

■ Appellants' next contention is that the court erred in limiting cross-examination of Ms. Kreager regarding "a pending charge for distribution of cocaine," because the "accused had the right to explore the veracity" of her statement in "a prior hearing,[13] where she had testified under oath before the same judge, that the alleged assault was the sole reason why her children were not in her custody...." In support of this contention, appellants assert that although "an event, such as an arrest," is "not independently admissible for impeachment purposes," if a witness "testifies untruthfully about that event," the witness may then be cross-examined about it, as the untruthful testimony is then relevant to an assessment of the witness' veracity. *Citing, e.g., State v. Cox*, 298 Md. 173, 179, 468 A.2d 319 (1983). Appellants contend that "so long as they were able to proffer another reason," unrelated to the

---

**13.** *See* n. 5, *supra,* and related text.

"alleged assault, why Ms. Kreager's children were not in her custody," i.e., because she "was arrested selling drugs to an undercover officer with [her] three children present" on October 18, 2007, the court should have allowed them to do so.

The State counters that appellants' contention was not properly raised below, but that even it was, it should be rejected on the merits. The State asserts that appellants' argument "rests on the assumption that Kreager lied in her victim impact statement when she represented that reunification with her children was being delayed as a result of the present case," which assumption is not supported by the record. The State explains that neither a copy or a transcript of Ms. Kreager's victim impact statement was provided to the court, and that absent counsel's proffer that " 'her testimony in the victim impact was that this incident is the reason she doesn't have the kids,' the record fails to indicate that Kreager identified the present case as the 'sole' reason for foster care placement.' " Rather, "the record shows that Kreager's children were not in her custody throughout the entire proceeding because she was homeless"; thus, "even if the foster care placement occurred as a result of Kreager's arrest, this fact would not render Kreager's victim impact statement false." Moreover, avers the State, even if the record did establish that Ms. Kreager "cited the present case as the 'sole' reason for foster care placement, which it does not, this fact would not permit impeachment with evidence regarding the circumstances of Kreager's arrest," as facts surrounding her arrest "remained collateral to the issues before the juvenile court," and, as correctly noted by the court, and as appellants expressly acknowledge, "arrests are not generally admissible for impeachment." We agree with the State, and shall briefly address the merits.

To restate, appellants assert that Ms. Kreager made a victim impact statement, under oath, at Shamira B.'s disposition hearing, testifying that the "sole reason" her children were not in her custody was because of the incident on the bus. Appellants argue that that statement opened the door

for them to cross-examine her with respect to an arrest in the presence of her children on October 18.

First, it is unclear from counsel's proffer to the court that Ms. Kreager testified during the victim impact statement that the only reason that her children were in foster care was because of this incident. Notably, the record fails to indicate that Ms. Kreager identified the present case as the "sole reason" for her children's placement in foster care. In fact, nothing in the record indicates why Ms. Kreager's children were placed in foster care—whether it be because she was distributing narcotics while they were present, or because she was arrested, or because she was homeless. A copy or transcript of the victim impact statement was not provided to the court, and during the proceedings at issue here, Ms. Kreager testified that her children were in foster care because she was homeless. She also agreed only that the bus incident was "part of" what was keeping her from her children, as the question posed by counsel for Ronald B. during the adjudicatory proceedings was whether, in her victim impact statement, Ms. Kreager had "indicated that this incident was part of the incident [sic] keeping [her] from [her] kids?" Ms. Kreager's affirmative response did not negate the possibility that there were other reasons that her children were placed in foster care, including the reasons given by Ms. Kreager during the proceedings at issue here, nor did it necessarily render her testimony false.

In any event, even if Ms. Kreager had cited the present case as the "sole reason" for foster care placement during her victim impact statement, that fact would not permit impeachment during these proceedings with evidence regarding the circumstances of her arrest, as the facts of her arrest were irrelevant and collateral to the issues before the juvenile court. The proffer by counsel did not include an assertion of evidence that the arrest was a reason why Ms. Kreager did not have her children. Thus, because arrests are not generally admissible for impeachment, and there is no indication that Ms. Kreager's arrest had any bearing on her credibility, or that

she testified untruthfully about her arrest, we perceive no error.

3.

Appellants' third contention is that the evidence was insufficient to sustain the court's findings of involved as to any appellant, with the exception of Ronald B.'s assault on Ms. Kreager based upon his affirmation that he "kicked" her. More specifically, first, appellants assert that the State failed to prove, with respect to Lavar D. and Britny C., "anything more than their presence, at the scene [of] the incident and, with regard to Ronald B., anything more than the fact that he struck Ms. Kreager 'once' in response to her and Mr. Ennis's aggression." In support of this contention, appellants argue that no witness at trial stated what, "if anything," any of the appellants did during the incident. Thus, "the only evidence produced by the State to demonstrated appellants' criminal agency was the fact that each was identified by either Mr. Ennis or Mr. Williams in an on-scene, show-up identification, minutes after the incident."

Secondly, appellants aver that there "is no evidence which shows that any appellant inflicted or attempted to inflict a serious physical injury," tantamount to a first degree assault. Appellants credit this lack of evidence to "the State's failure to prove what any of the appellants did," asserting that "there is absolutely no evidence to establish that any appellant engaged in conduct which created a risk of serious physical injury, let alone evidence that appellants engaged in activities which demonstrated that they had the requisite specific intent to cause a serious physical injury."

Thirdly, appellants contend that the evidence is insufficient to establish the crime of conspiracy to commit first degree assault because there was no evidence of the "gravaman of the offense: an agreement between each appellant and another to engage in the act of first-degree assault." Appellants continue that here, "due primarily to the failure of the State to prove what, exactly, any appellant did (other than Mr. B. struck Ms. Kreager 'once' in self-defense) and, specifically, the failure to

prove that any appellant engaged in an act with the specific intent to cause serious injury, in equal force the State cannot prove that the appellants harbored both the specific intent to agree, with others, to engage in the first-degree assault of Ms. Kreager, nor the specific intent 'to assist in some way in causing that crime to be committed.' "

Finally, appellants contend that the evidence is insufficient to establish that they acted in a disorderly manner or disturbed the public peace because, again, "due to the State's failure to prove what, if anything, any appellant did during this incident, the State clearly did not prove (a) that any appellant acted in a disorderly manner; (b) that any appellant disturbed the public peace; or (c) assuming that either was shown, that any appellant did so with the specific intent required by the statute." Appellants opine that "[a]t most, the State proved that each appellant was on board a rowdy bus."

The State counters that (1) the State's theory of the case was that appellants conspired to commit the acts against Ms. Kreager and Mr. Ennis, and that the evidence adduced at trial, which included both Mr. Williams's and Mr. Ennis's testimony that they identified the individuals involved in the attack; Ms. Curtis's diagram showing that both Britny C. and Ronald B. were seated at the rear of the bus with Nakita M. and Ms. Kreager at the time of the attack; Ms. Kreager's testimony that someone wearing a green jacket kicked her; Lavar D.'s identification as the only suspect wearing a green jacket; and, the testimony of each witness regarding the attack, supported a finding that each appellant "participated in the mass assault on Kreager and [Ennis]"; (2) the testimony of Dr. Ali, describing Ms. Kreager's injuries, established the "criteria for serious physical injury" necessary to support a finding of involved as to the charges of first degree assault, and that from the evidence establishing that each appellant was an active participant in hitting, punching, and kicking Ms. Kreager, the court was "permitted to draw the inference that the juveniles intended to inflict serious physical injury"; (3) testimony from Ms. King, Ms. Kreager, and Mr. Ennis estab-

lished that the group of juveniles was "acting in unison," which is sufficient to establish the elements of conspiracy; and, (4) again, as set forth previously, the evidence established that appellants "together created the disturbance by acting in concert in a disorderly manner." We agree that the evidence was sufficient to find each appellant involved as to the crimes of first degree assault, conspiracy to commit first degree assault, and acting in a disorderly manner or disturbing the peace, and shall explain.

Preliminarily, we note the following.

A delinquent act is an act which would be a crime if committed by an adult. Maryland Code (2006 Repl. Vol.), § 3–8A–01 of the Courts & Judicial Proceedings Article ("C.J."). As with a criminal proceeding, in an adjudicatory hearing in a juvenile delinquency proceeding, the State must present evidence sufficient to prove beyond a reasonable doubt that the juvenile committed the delinquent act or acts. Maryland Rule 11–114(e)(1); C.J. 3–8A–18. *See In re Winship*, 397 U.S. 358, 368, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). *See also, e.g., In re Ondrel M.*, 173 Md.App. 223, 230–31, 918 A.2d 543 (2007) (recognizing that in juvenile delinquency proceedings, the delinquent act must be proven beyond a reasonable doubt.).

The standard for reviewing the sufficiency of the evidence is "whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 313, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see State v. Smith*, 374 Md. 527, 533, 823 A.2d 664 (2003). We give "due regard to the [fact finder's] finding of facts, its resolution of conflicting evidence, and significantly, its opportunity to observe and assess the credibility of witnesses." *Harrison v. State*, 382 Md. 477, 488, 855 A.2d 1220 (2004) (quoting *McDonald v. State*, 347 Md. 452, 474, 701 A.2d 675 (1997), *cert. denied*, 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998) (other citation omitted)). Furthermore, when an action has been

tried without a jury, we will review the case on both the law and the evidence, and we will not set aside the judgment of the trial court on the evidence unless clearly erroneous. Maryland Rule 8–131(c). "We do not measure the weight of the evidence; rather we concern ourselves only with whether the verdict was supported with sufficient evidence, direct or circumstantial, which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *McDonald,* 347 Md. at 474, 701 A.2d 675 (citing *State v. Albrecht,* 336 Md. 475, 478–79, 649 A.2d 336 (1994)). This same standard of review applies in juvenile delinquency cases. *In re Timothy F.,* 343 Md. 371, 380, 681 A.2d 501 (1996).

The standard for assessing the sufficiency of the evidence applies to all criminal cases, including those resting upon circumstantial evidence. *Jensen v. State,* 127 Md.App. 103, 117–20, 732 A.2d 319 (1999). In fact, there is "no difference between direct and circumstantial evidence." *Hebron v. State,* 331 Md. 219, 226, 627 A.2d 1029 (1993). "Circumstantial evidence is as persuasive as direct evidence. With each, triers of fact must use their experience with people and events to weigh probabilities." *Mangum v. State,* 342 Md. 392, 400, 676 A.2d 80 (1996) (citation omitted). Thus, "[c]ircumstantial evidence alone is sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused." *Painter v. State,* 157 Md.App. 1, 11, 848 A.2d 692 (2004) (citation omitted).

We shall turn to the merits.

During closing arguments, the State explained that it was basing its theory of the case on *Grandison,* which holds that "one who encourages, aids, abets, or assists the active perpetrator in the commission of the offense is a guilty participant, and in the eye of the law is equally culpable with the one who does the act," 305 Md. at 703, 506 A.2d 580, and that where the existence of a conspiracy is established, "the law imposes on a conspirator full responsibility for the logical and natural consequences of acts committed by his fellow conspirators if

such acts are done in the pursuance in the common design or purpose of the conspiracy." *Id.* Under this theory, the evidence was sufficient to sustain the juvenile court's adjudication of involved as to all appellants and as to all counts.

As stated above, appellants first assert that although "[d]ue process requires the State to establish every fact necessary to constitute the crime with which the defendant is charged, including his criminal agency, beyond a reasonable doubt," *Robertson v. State*, 112 Md.App. 366, 375, 685 A.2d 805 (1996), the "only evidence produced by the State to demonstrate appellants' criminal agency was the fact that each was identified by either Mr. Ennis or Mr. Williams in an on-scene, show-up identification, minutes after the incident"; thus, the State failed to prove "anything more than the presence" of appellants [14] at the scene, which, according to appellants, is insufficient pursuant to *Johnson v. State*, 227 Md. 159, 175 A.2d 580 (1961) and *Woodard v. State*, 16 Md.App. 300, 295 A.2d 789 (1972). We disagree, and without restating all of the evidence adduced at the hearing, as we have already done so in detail above, note that the evidence presented tended to establish the following.

Both Mr. Williams and Mr. Ennis testified to the activity that they observed, both on and off of the bus, and identified appellants shortly thereafter as the individuals involved in that activity. Specifically, after hearing an exchange between Ms. Kreager and a heavy-set girl on the back of the bus, Mr. Williams observed the "whole back of the bus" jump on Ms. Kreager and Mr. Ennis. When Mr. Williams stopped the bus, he saw Ms. Kreager and Mr. Ennis "forced out ... being beaten, kicked, and stomped." He also observed the "heavy-set girl" strike Ms. Kreager, and then the "other students" following. Before Mr. Ennis fell out of the back door of the

---

**14.** As stated above, we note that Ronald B. agrees that the sufficiency of the evidence to sustain his finding of involved with respect to the assault on Ms. Kreager can not be challenged based on his affirmation that he kicked her. For ease, we shall address the contention without singling out Ronald B.

bus, Mr. Williams noticed about six students around him. He also saw 18–20 students exit the back door, and then saw them beating Ms. Kreager. The students who could not get out of the back of the bus ran to the front and started "kicking" the front door.

After the attacks, Mr. Williams selected nine individuals, whom he identified as being involved in the beatings. Mr. Williams stated that he "pointed to the ones" he knew, and that he was "[o]ne hundred percent" certain that he had identified the correct individuals.

Mr. Ennis testified that after a "heavy-set" girl began fighting with Ms. Kreager, another girl grabbed Ms. Kreager's hair. After Mr. Ennis tried to get Ms. Kreager behind him, the "whole front of the bus and the back of the bus" came towards them, trying to "bum rush" them. After he and Ms. Kreager got off the bus, several of the juveniles attacked him and Ms. Kreager. Once police arrived, Mr. Ennis identified the "kids . . . who assaulted [him] or who [he saw] assaulting" Ms. Kreager.

Ms. Kreager also testified to the activity on the bus. She testified that Nakita M. hit her and grabbed her hair, while another female came over and also grabbed her by her hair. Both girls tried to pull Ms. Kreager into the "crowd" that was becoming aggressive. Ms. Kreager identified a male wearing a green jacket as the individual who kicked her in the face. Lavar D. was the only individual identified wearing a green jacket.

Ms. King testified that she saw "[a]ll of the children [that] came off the bus" kicking and punching Ms. Kreager.

Ms. Curtis created a diagram indicating that Ronald B., and Britny C. were sitting in the back of the bus with Nakita M. when the fighting occurred. As stated, Ronald B. admitted to kicking Ms. Kreager.

The cases relied on by appellant are factually distinct, *see Johnson, supra,* (finding that although the accused was present at the scene, the evidence was not sufficient to support a

robbery conviction where there was no direct evidence, nor any evidence to support a rational inference that the accused was either a principal or an aider and abettor); *Woodard, supra,* (finding that the accused's presence in the store at the time of the robbery was the only affirmative evidence offered by the State to support its charge that he was a participant in the robbery), and otherwise inapposite. Unlike in those cases, in the present case, there was ample evidence to conclude that each of the appellants was actively involved in the assaults on Ms. Kreager, Mr. Ennis, or both.

 We now turn to appellant's second sub-argument, i.e., that the evidence was insufficient to establish that appellants committed the crime of first-degree assault.

First-degree assault is defined in Maryland Code (2002 Repl. Vol.), § 3–202(a)(1) of the Criminal Law Article ("CL"): "A person may not intentionally cause or attempt to cause serious physical injury to another." "Serious physical injury" is defined as physical injury that "creates a substantial risk of death." CL § 3–201(c).

In *Chilcoat v. State,* 155 Md.App. 394, 843 A.2d 240, *cert. denied,* 381 Md. 675, 851 A.2d 594 (2004), we explained that "serious physical injury" may be proved

> by evidence establishing that the defendant inflicted physical injury by "an act performed under circumstances that create a substantial risk of death." This definition of serious physical injury focuses on the circumstances in which the defendant performed the act that caused physical injury.

*Id.* at 403, 843 A.2d 240 (quoting *Konrad v. Alaska,* 763 P.2d 1369, 1376 (Alaska Ct.App.1988)).

Furthermore, we explained that

> the statute prohibits not only causing, but attempting to cause, a serious physical injury to another. Although the State must prove that an individual had a specific intent to cause a serious physical injury, *see Dixon v. State,* 364 Md. 209, 239, 772 A.2d 283 (2001) [parallel citation omitted], a jury may infer the necessary intent from an individual's

conduct and the surrounding circumstances, whether or not the victim suffers such an injury. *See Ford v. State,* 330 Md. 682, 703, 705 n. 9, 625 A.2d 984 (1993) [parallel citation omitted]. Also, the jury may "infer that 'one intends the natural and probable consequences of his act.'" *Id.* at 704, 625 A.2d 984 (citation omitted).

*Chilcoat,* 155 Md.App. at 403, 843 A.2d 240.

We have already established that the evidence was sufficient to conclude that each of the appellants was an active participant in the group of juveniles involved in the attack. Thus, we are only left with the question of whether the assaults were in the first-degree.

Pursuant to Dr. Ali's testimony, we have little difficulty concluding that the injuries to Ms. Kreager satisfied the criteria for a "serious physical injury." Dr. Ali testified that she was "prepared to take care of a trauma patient," as the paramedics had designated that Ms. Kreager "had the potential for serious life threatening injury. . . ." Dr. Ali stated that Ms. Kreager had a "very significant injury" to her left eye, and a CT scan of Ms. Kreager's face revealed "quite a severe injury to the eye," including "multiple orbital fractures." According to Dr. Ali, the injuries had the "potential for loss of vision."

■ Moreover, as we stated above, the evidence established that Lavar D., Britny C., and Ronald B. were active participants in a group of individuals who repeatedly hit, punched, and kicked Ms. Kreager. From these acts, the court was permitted to draw the inference that the juveniles intended to inflict serious physical injury.

■ Appellants' third sub-argument is that the evidence was insufficient to establish the elements of conspiracy to commit first degree assault. The thrust of appellants' argument is that the State failed to prove "an agreement."

In *Cooper v. State,* 128 Md.App. 257, 737 A.2d 613 (1999), we stated:

The elements of a criminal conspiracy are (1) the combination of two or more persons, (2) to accomplish some unlawful purpose. Although the essence of a criminal conspiracy is an unlawful agreement, the State is not required to offer proof of any formal arrangement; rather, a conspiracy can be inferred from the actions of the accused. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design.

*Id.* at 267, 737 A.2d 613 (internal citations omitted).

To reiterate the testimony briefly, after Ms. Kreager sat down and Nakita M. told her that she needed to move, she heard someone say, "If she doesn't want to move, we'll move that bitch." Ms. Kreager then told Mr. Ennis that she believed "these girls" were trying to start something with her. Nakita M. then stated that this "is our bus."

After the verbal exchange, Nakita M. struck Ms. Kreager, and then Ms. Kreager heard uproar, noise, and commotion "coming from everywhere." Nakita M. and another girl had her by her hair and were pulling her into the crowd, that was becoming anxious, excited, and aggressive. When Mr. Ennis threw Ms. Kreager behind him, the crowd of students charged Mr. Ennis.

When Mr. Ennis and Ms. Kreager got off the bus, she saw the group of kids on the bus moving towards the front. Mr. Ennis tried to hold the doors closed, but there were students pushing through the door, and then the doors "burst out" and a large group of students got off the bus.

Off of the bus, Ms. Kreager was charged and tackled by Nakita M. and another female. A male struck her with a closed fist. She ended up on the ground, and "more people were coming over" and kicking her. She felt more than one person lift her head up and heard a female say, "kick that bitch." A male then kicked Ms. Kreager in her eye.

In addition to Ms. Kreager's testimony, eyewitnesses also testified that a group of students descended on Ms. Kreager and Mr. Ennis after Nakita M. hit Ms. Kreager, as well as after Ms. Kreager got off of the bus. We have already set

forth that testimony above. The evidence in this case established the requisite elements for conspiracy.

Appellants' last sub-argument is that the evidence was insufficient to establish that appellants acted in a disorderly manner or disturbed the public peace.

Section 10–201(c)(2) of the Criminal Law Article provides that "[a] person may not willfully act in a disorderly manner that disturbs the public peace." The "gist of the crime of disorderly conduct . . . is the doing, or saying, or both, of that which offends, disturbs, incites, or tends to incite, a number of people gathered in the same area." *Spry v. State*, 396 Md. 682, 914 A.2d 1182 (2007) (other citations omitted). Again, we conclude that the evidence was sufficient to support a finding of disorderly conduct as to each appellant.

The evidence established that a group of juveniles conspired to assault Ms. Kreager and/or Mr. Ennis on the bus that day. During the attacks, Ms. King saw the bus "rocking" violently and thought that there was a "riot on the bus." Mr. Williams reported that a group of juveniles on the bus "went crazy," and that a "riot broke out." The interior of the bus was damaged during the attacks. We fail to see how this, as well as all of the other evidence adduced, does not support a finding of disturbing the peace.

### 4.

Next, appellants contend that the court erred in failing to suppress Ronald B.'s custodial statement to police, because the statement was made in response to police inducement. Relying on *In re Lucas F.*, 68 Md.App. 97, 510 A.2d 270 (1986), appellants argue that "it is clear that Mr. B.'s statement was the product of police inducement," because in "exhorting Mr. B. to '[h]help [sic] yourself' before 'four [other respondents] tell me exactly what happened and exactly what you did,'" was an inducement for Ronald B. to give a statement.

The State counters that Sergeant Combs' explanation to Ronald B. during the police interview, as set forth above,

"did not constitute either an implied promise of leniency or threat of harm," and "there was no inducement or reliance thereon." Rather, contends the State, Sergeant Combs was "commenting on the videotape that he believed would be forthcoming that would clearly identify the actions of the juveniles." Even if the comments could be read "as constituting an implied promise," however, "Ronald B.'s claim of inducement fails because there was no evidence that Ronald's decision to make a statement was the product of these comments." In fact, "Ronald gave his statement in response to Combs' suggestion that Ronald reacted to Kreager's and Ennis' use of force." In any event, opines the State, any error was harmless "because the evidence of his involvement, excluding his statement, was overwhelming." Again, we agree that there was no implied promise, and explain.

In *Hillard v. State*, 286 Md. 145, 406 A.2d 415 (1979), the trial judge found as a fact that a police officer investigating a homicide told Hillard that if he was telling the truth about his involvement, the officer would "go to bat" for him by telling the State's Attorney's office and the court that he had cooperated, that he had told the truth, and that he was not knowledgeable with regard to the homicide. *Id.* at 153, 406 A.2d 415. The Court of Appeals concluded that this finding "confirmed that the officer had promised the defendant help if he would make a statement ... [and] ... established the statement ... was involuntarily obtained ...." *id.*, and held that,

> if an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his declaration will be considered to have been involuntarily made and therefore inadmissible.

*Id.* at 153, 406 A.2d 415.

The Court also noted that "any decision concerning the voluntariness of a statement necessarily must rest on the facts of the case involved...." *Id.* at 151, 406 A.2d 415.

Cases subsequent to *Hillard* explained further that while "[a] mere exhortation to tell the truth is not enough to make a statement involuntary," an "entreaty to 'tell the truth' coupled with a promise that there would be benefits to the suspect ... can render the statement involuntary," *Reynolds v. State*, 327 Md. 494, 507, 610 A.2d 782 (1992) (other citations omitted), and that the "rule in *Hillard* announces that a statement is rendered involuntary if it is induced by an *official* promise which redounds to the benefit or desire of the defendant." *Pappaconstantinou v. State*, 352 Md. 167, 176, 721 A.2d 241 (1998) (emphasis in original) (citing *Reynolds*, 327 Md. at 508–09, 610 A.2d 782).

In *In re Lucas F.*, relied on by appellants, ten-year-old Lucas was suspected of the assault of a seven-year-old playmate. 68 Md.App. at 100, 510 A.2d 270. After initially denying involvement, and providing the police with descriptions of fictitious assailants, Lucas became a suspect in the assault, which left his playmate with amnesia. *Id.* During police questioning of Lucas, outside of the presence of his mother, Lucas verbally admitted that he had fabricated the earlier story concerning the assailants, and said that his playmate was accidentally injured when he hit his head on some rocks in the creek where the boys were playing. *Id.* at 101, 510 A.2d 270. With respect to this statement, a police detective testified that he had told Lucas that "eventually [his playmate] would remember what happened.... If what Lucas had told me was not the truth and was not everything that had occurred, that now was the time to tell me so that there would be no problem later if [his playmate] recalled a different account of the incident." *Id.* at 105, 510 A.2d 270. We reversed, holding:

> It is abundantly clear that [the police detective's] testimony represents an inducement to Lucas to tell the truth "so there would be no problem later." That exhortation by the detective might have sown, and probably did sow, the seeds of a subauditur in Lucas's mind that if he related the events that had transpired at the creek, he would avoid subsequent problems. The inducement, we think, flies straight in the

face of *Hillard* and, consequently, was impermissible. For that reason alone, Lucas's statement should have been suppressed.

*Id.*

Appellants assert that the "inducement *sub judice* is indistinguishable from that in *Lucas*," and that Sergeant Combs' statement to Ronald B. to explain to him what had happened, "[a]fter now is too late," was improper inducement. Particularly, appellants take issue with the emphasized portions of Ronald B.'s police interview, below.

SGT. COMBS: You understand something. It's on video and there's witnesses. And then you go to court lying to me about what happened.

[RONALD B.]: I don't know (INAUDIBLE)

SGT. COMBS: *Help yourself cause I guarantee you out of that group out there, nine people, four of them are going to tell me exactly what happened and exactly what you did then what are you going to do?* Eighteen years I been doing this job. I know what I'm doing so now you can tell me the truth or we can put down what you just told me and we can go to court and say, not only did he lie[ ] about it and has no remorse over what he did at all. You understand what I'm saying? So what's the judge going to do at that point? He did it. I see he did it. I've got witnesses that say he did it and he going to sit there and lie about it and basically don't care that he did it.

[RONALD B.]: (Inaudible)

SGT. COMBS: Well then explain it to me. *If these people did something to make you do this then you've got to explain that to me right now.*

[RONALD B.]: Yeah, they was (INAUDIBLE)

SGT. COMBS: *After now is too late.*

[RONALD B.]: Huh?

SGT. COMBS: *After now is going to be too late.* So they were trying to do what? They tried to hit you, right?

[RONALD B.]: Yeah.

SGT. COMBS: And then what did you do?

[RONALD B.]: I hit them back.

SGT. COMBS: You hit them back?

[RONALD B.]: Yeah.

SGT. COMBS: Who did you hit?

[RONALD B.]: I think ... I hit the girl.

SGT. COMBS: You hit the girl, okay. [Y]ou kick her?

[RONALD B.]: I don't think so.

SGT. COMBS: There was a whole group around you that started stomping on her.

[RONALD B.]: It was?

SGT. COMBS: Yes. And you were in that group, correct?

[RONALD B.]: Yes.

\* \* \*

SGT. COMBS: Yes. So you kicked her?

[RONALD B.]: Yes.

\* \* \*

We disagree with appellants that this exchange is indistinguishable from *Lucas*, or that it falls short of the mandates of *Hillard* and its progeny.[15] Unlike in *Lucas*, as the above-exchange indicates, Sergeant Combs made no promises to Ronald B. that he should tell the truth "so there would be no problem later." Rather, Sergeant Combs informed Ronald B. of the evidence that he believed would show Ronald B.'s level of involvement, and that Ronald B. should tell the truth. Based on the facts of this case, we can not conclude that there was either any inducement, nor that Ronald B. relied on anything Sergeant Combs said in making his statement. We perceive no error.

---

**15.** This case is also distinguishable from *Logan v. State*, 164 Md.App. 1, 47–48, 882 A.2d 330 (2005), *aff'd State v. Logan*, 394 Md. 378, 906 A.2d 374 (2006) (statement by police officer that telling the truth would not hurt rendered *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) waiver invalid).

5.[16]

6.

 Appellants' next argument is that the court erred in precluding the defense from cross-examining Mr. Ennis about his alleged past domestic abuse of Ms. Kreager. Appellants assert that they had presented evidence that Ms. Kreager had a black eye when she boarded the bus, and that the evidence that her only "significant injury was preexisting had an obvious impact in assessing Kreager and Ennis's allegations that they were assaulted on the bus," and also "was evidence of an 'obvious motive' for Mr. Ennis to ascribe the existence of the black eye to someone else...."

The State counters the court exercised its discretion and excluded irrelevant evidence. In support of this contention, the State asserts that the "issue raised by the juveniles, i.e., whether Ms. Kreager's injury was pre-existing," was irrelevant, even if true, because "whether Ennis had been abusive to Kreager prior to the bus attack or the fact that Kreager may have filed for a protective order[17] was not relevant to the issues before the court," and, in any event, there was ample evidence that Ms. Kreager did not have a preexisting injury. We agree, and briefly explain.

> The conduct of the trial "must of necessity rest largely in the control and discretion of the presiding judge," and an appellate court should not interfere with that judgment unless there has been error or clear abuse of discretion. *See Wilhelm v. State,* 272 Md. 404, 413, 326 A.2d 707 (1974); *Simpson v. State,* 121 Md.App. 263, 283, 708 A.2d 1126 (1998). Consistent with the trial court's authority concerning the conduct of trial, "the scope of examination of witnesses at trial is a matter left largely to the discretion of the trial judge and no error will be recognized unless there is clear abuse of discretion." *Oken v. State,* 327 Md. 628, 669,

---

**16.** As noted above, appellants' argument # 5 was withdrawn.

**17.** *See* n. *9, supra.*

612 A.2d 258 (1992), *cert. denied*, 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993) [other citations omitted].

To be sure, "a cross-examiner must be given wide latitude in attempting to establish a witness' bias or motivation to testify falsely." *Merzbacher v. State*, 346 Md. 391, 413, 697 A.2d 432 (1997) [other citation omitted]. Nevertheless, a "balancing test" must be employed by the trial judge, so that "questioning [is] not . . . allowed to stray into collateral matters which would obscure the trial issues and lead to the factfinder's confusion." *Smallwood v. State*, 320 Md. 300, 307–308, 577 A.2d 356 (1990).

"As the decision to limit cross-examination ordinarily falls within the sound discretion of the trial court, our sole function on appellate review is to determine whether the trial judge imposed limitations upon cross-examination that inhibited the ability of the defendant to receive a fair trial." *Merzbacher*, 346 Md. at 413, 697 A.2d 432; *see Churchfield v. State*, 137 Md.App. 668, 682–84, 769 A.2d 313 (2001). Although trial courts may impose " 'reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant[,]' . . . limitation of cross-examination should not occur . . . until after the defendant has reached his 'constitutionally required threshold level of inquiry.' " *Merzbacher*, 346 Md. at 413, 697 A.2d 432 (alterations in original) (internal citations omitted).

*Thomas v. State*, 143 [Md.]App. 97, 109–112[, 792 A.2d 368], *cert. denied*, 369 Md. 573, 801 A.2d 1033 (2002) (parallel citations omitted)

In addition to the foregoing, we note that although relevant evidence, i.e., evidence that tends either to establish or disprove issues in the case, *see Snyder v. State*, 361 Md. 580, 591, 762 A.2d 125 (2000); Maryland Rule 5–401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"), is generally admissible pursuant to

Maryland Rule 5–402, the determination of what evidence is material and relevant is a matter left to the sound discretion of a trial court. *See, e.g., Sifrit v. State,* 383 Md. 116, 128, 857 A.2d 88 (2004).

In the present case, and based on the foregoing, we disagree with appellants that the court abused its discretion in precluding the defense from cross-examining Mr. Ennis about alleged past domestic abuse of Ms. Kreager. The issue raised by appellants at trial was whether Ms. Kreager's injuries were pre-existing. Appellants put forth some evidence, i.e., the testimony of Ms. Curtis, that Ms. Kreager boarded the bus with a black eye. Appellants contend that a prior injury "had an obvious impact in assessing [Ms.] Kreager and [Mr.] Ennis's allegations that they were assaulted on the bus," and that this area of cross-examination was "crucial to exposing a key reason why the witness would shade his or her testimony, or establish[ ] a key theory of the case for the defense."

Ms. Curtis's testimony, as well as the statements of some of the respondents, notwithstanding, there was other evidence before the court that Ms. Kreager did not have any injuries to her eye when she boarded the bus, and that she was attacked by a group of juveniles both on and off the bus, and suffered injuries. Moreover, there was substantial evidence that, even if a preexisting injury existed, it was much worse after the incident. Even if Mr. Ennis did physically abuse Ms. Kreager prior to the bus incident, any evidence of such abuse was irrelevant and collateral to the issues before the court, and would not negate the fact that appellants conspired to, and did in fact, assault Ms. Kreager, causing serious injury.

### 7.

Appellants next assert that the court erred in allowing the use of statements containing "omitted and deleted passages implicating other respondents." According to appellants, the admission of the redacted statements was inconsistent with *Bruton,* n. 2, *supra,* and *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), because the "blank and blacked-out passages raise obvious questions about

what might have been said in those omitted passages," and the statements "clearly impl[ied] the participation of the accused."

The State counters that appellants waived this argument when appellants agreed to "the admission of the transcripts of the statements with the *Bruton* redactions," and that nevertheless, even if properly before this Court, appellants' argument fails because "it was clear that more than forty juveniles were on the bus at the time of the attack, and the testimony established that" "several juveniles involved in the assault . . . were not part of the present proceeding, including Shamira B . . . ."; thus, "the redacted statements would not cause the court to infer participation based on the omissions from the statements." Again, we agree with the State, and explain.

First, with respect to preservation, as is set forth above, the court ordered that counsel consult on the redactions prior to trial, and subsequently verified that the "redactions are both satisfactory to the State and the Defense . . ." Both the State and counsel for each appellant responded in the affirmative, and at the adjudicatory hearing, counsel clearly agreed to the admission of the transcripts of the statements with the redactions. Thus, we agree that appellants' argument is not preserved. Nevertheless, we shall briefly address the merits.

In *Bruton*, petitioner Bruton and his co-defendant, Evans, were tried jointly on the charge of armed postal robbery. *Bruton*, 391 U.S. at 124, 88 S.Ct. 1620. A postal inspector testified at that trial that Evans had orally confessed to him that he and Bruton had committed the armed robbery. *Id.* On appeal, the Court of Appeals for the Eighth Circuit, relying on *Delli Paoli v. United States,* 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), affirmed Bruton's conviction because the trial judge had instructed the jury that although Evans' confession was competent evidence against Evans, it was inadmissible hearsay against Bruton and therefore had to be disregarded in determining Bruton's guilt or innocence. *Bruton*, 391 U.S. at 125, 88 S.Ct. 1620.

The Supreme Court granted certiorari to reconsider the question of "whether the conviction of a defendant at a joint

trial should be set aside although the jury was instructed that a co-defendant's confession inculpating the defendant had to be disregarded in determining his guilt or innocence." *Id.* at 123–24, 88 S.Ct. 1620. In considering the question, the Court explained:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weight their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

*Id.* at 135–36, 88 S.Ct. 1620 (internal citations and footnotes omitted).

Thus, the Court held that a defendant's rights under the confrontation clause of the Sixth Amendment were violated by the introduction, at a joint criminal trial, of a non-testifying co-defendant's confession which named and incriminated the defendant, and that a limiting instruction to the jury was not "an adequate substitute for [a] petitioner's ... right of cross-examination." *Id.* at 137, 88 S.Ct. 1620.

Following *Bruton*, the Supreme Court addressed the circumstance where the prosecution redacted the co-defendant's confession by substituting for the defendant's name in the confession a blank space or the word "deleted." *Gray*, 523 U.S. at 188, 118 S.Ct. 1151. In *Gray*, Anthony Bell confessed to the police that he, Gray, and another man, who subsequently died, participated in the beating that caused the death of

Stacy Williams. *Id.* The State tried Bell and Gray jointly. *Id.* When the trial judge permitted the State to introduce a redacted version of Bell's confession, the detective who read it to the jury said "deleted" or "deletion" whenever the name of Gray or the deceased participant appeared. *Id.* Immediately after the police detective read the redacted confession to the jury, the State asked, "after he gave you that information, you subsequently were able to arrest [Gray]; is that correct?" *Id.* at 188–89, 118 S.Ct. 1151. The detective responded, "That's correct." *Id.* at 189, 118 S.Ct. 1151. The State also introduced into evidence a written copy of the confession with those two names omitted, leaving in their place blank white spaces separated by commas. *Id.*

Considering *Bruton,* and a later case, *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), the Supreme Court held that a redaction that "replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol . . . falls within *Bruton's* protective rule." *Gray,* 523 U.S. at 192, 118 S.Ct. 1151. That is not the situation before us.

In the present case, the redacted statements do not implicate co-respondents. First, there was testimony that there were at least 40 students on the bus when the attacks occurred. The testimony also established that not all of the juveniles involved in the attacks were parties to the adjudicatory proceedings. Contrary to appellants' contention, it is not clear that the statements were "only redacted to omit reference to the juveniles who were on trial." In fact, it is not at all clear from the redacted statements who, if anyone, was being implicated. We do not agree that the blanked out passages would cause the court to infer participation of any one individual based on the omissions from the statements, and the redacted statements do not, on their face, inculpate any individual. We perceive no error.

### 8.

Finally, appellants argue that the court erred when it sustained the State's objection to its attempted use of a

document to refresh Mr. Ennis's recollection regarding whether he had contact with the police on October 18, 2007. They argue, first, that it "is clear that the trial court was incorrect in ruling that a party 'can't [use] a document he didn't prepare to refresh his recollection ...,'" and, second, that as "one of the key issues at trial was the credibility of Mr. Ennis and Ms. Kreager," an "admission from Mr. Ennis that he had provided false information to the police ... would have an obvious impact in assessing the veracity of the information provided to police on ... December 4, 2007."

The State counters, initially, that appellants' argument is not preserved because "counsel failed to bring to the court's attention the court's apparent misstatement with regard to using a document to refresh the witness's recollection," i.e., because the court "confused the distinction between the doctrine of present recollection refreshed, and that of past recollection recorded." Secondly, the State avers that "no prejudice inured to the juveniles as a result of the court's failure to permit counsel to refresh Ennis' recollection regarding his contact with police," because even if Mr. Ennis's memory could have been refreshed, that evidence still would have been inadmissible based on the trial court's prior ruling that an arrest could not be used to impeach a witness' testimony.[18] Furthermore, the "only testimony which may have benefitted the juveniles would be Ennis' refreshed recollection that he did, in fact, use an alias when he came into contact with police," and it was stipulated that Mr. Ennis had give the name "Troy Stenson to a police officer" on a prior occasion. We agree with the State on the merits.

Initially, we note that any confusion on the part of the court between the doctrine of present recollection refreshed and that of past recollection recorded notwithstanding, *see Butler v. State,* 107 Md.App. 345, 667 A.2d 999 (1995), as we explained above, the court had already appropriately ruled that Ms. Kreager's arrest, at the same time and under the same

---

18. *See* issue # 2, *supra.*

circumstances as Mr. Ennis's arrest, could not be used to impeach the witness, and that the facts of the arrest were irrelevant and collateral to the issues before the court. The same principle applies to Mr. Ennis's arrest. Moreover, however, even if the court would have allowed Mr. Ennis's recollection to be refreshed, the only testimony which may have benefited appellants would have been his refreshed recollection that he did, in fact, use an alias when he came into contact with police. This evidence was before the trier of fact, both through the testimony of Officer McCarty, and through the stipulation that Mr. Ennis gave the name "Troy Stenson" to a police officer on October 18. Thus, any error was harmless. *See Dorsey,* 276 Md. at 659, 350 A.2d 665.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**